12 U.S. 462
 8 Cranch 462
 3 L.Ed. 624
 ALEXANDER AND OTHER
v.
PENDLETON.
 March 12, 1814
 
 1
 THIS was an appeal from the Circuit Court of the district of Columbia, sitting at Alexandria, as a Court of Equity.
 
 
 2
 The case, as stated by MARSHALL, Ch. J. in delivering the opinion of the Court, was as follows:
 
 
 3
 This suit was brought in the year 1806, in the Circuit Court for the county of Alexandria, for the purpose of quieting the title of Nathaniel Pendleton, the Plaintiff in that Court, to 83 acres of land contiguous to the town of Alexandria which have been in his possession, and in the possession of those under whom he claims, from the year 1732 to the present time.
 
 
 4
 Robert Alexander, being seized of a large tract, on part of which the town of Alexandria now stands, on the 17th of January in the year 1731-2, executed to Dade Massey, then about to intermarry with his daughter Parthenia Alexander, his bond in the penalty of 800l. with a condition that he would convey to his daughter Parthenia and her heirs, on demand, four hundred acres of land lying on Potomac, 'beginning on the river side and from thence running to his back line, making a long square so as to have the same breadth on the river as on the back line.'
 
 
 5
 The marriage soon afterwards took effect, and she was put into possession of the land by the following bounds, that is to say: 'Beginning at the mouth of Goings gut, on the river Potomac, and extending down the river so as to include four hundred acres of land between the river and the back line.'
 
 
 6
 The back line called for in the patent was a due north course; that by which Robert Alexander then held was north 6 west. Claims have been since successfully asserted which would vary the back line so as to run north 17 west. The Appellants insist that those who hold under Parthenia shall be compelled to extend to the back line, as now established, and proportionably to contract their line down the river, so that the parallelogram shall still comprize four hundred acres. Pendleton, who is a purchaser under Parthenia, insists on being limited on the west by the line north 6 west, which was the back line when the title of Parthenia accrued.
 
 
 7
 In the year 1735, Robert Alexander departed this life, having first made his last will in which he devised as follows: 'Item, I give to my daughter Parthenia Massey four hundred acres in Prince William county, according to my bond. Item, I give to my daughter Sarah Alexander, four hundred acres joining Parthenia Massey, the same length on the back line and the same breadth on the river.'
 
 
 8
 Parthenia survived her husband, Dade Massey, and intermarried with Townshend Dade. Sarah intermarried with Baldwin Dade, and was put into possession of the land devised to her.
 
 
 9
 John and Gerard Alexander were the only sons of Robert, and were the co-devisees of the bulk of his estate. In April, 1740, John instituted a suit against Gerard for partition; and to this suit Townshend Dade and Parthenia, his wife, and Baldwin Dade and Sarah, his wife, were parties Defendants. A decree of partition was made, directing that the lands of the Dades also should be allotted to them to be held in severalty. Commissioners were appointed to execute this decree, with directions to report their proceedings to the Court.
 
 
 10
 Under this interlocutory decree the land was surveyed by Joseph Berry, and a division made. Four hundred acres were allotted to Townshend Dade and Parthenia, his wife, and the same quantity to Baldwin Dade and Sarah, his wife. This allotment was made on the idea that north 6 west was the true back line. But as the Alexanders intended to institute suits for the purpose of recovering lands lying west of the north 6 line, it was agreed between all the parties that the partition then made should not be conclusive, but should depend on the suits about to be instituted. In consequence, as is presumed, of this verbal agreement, the survey and proceedings under this interiocutory decree were not returned; and in May, 1741, the suit was dismissed agreed.
 
 
 11
 Townshend Dade and Parthenia, his wife, remained in quiet possession of the four hundred acres devised to Parthenia by her father, according to those boundaries which had been marked out on the idea that north 6 west was the true back line.
 
 
 12
 Sarah Dade died without issue; on which event her land was limited to her two brothers John and Gerard, who entered thereon and continued to hold it according to Berry's survey.
 
 
 13
 John Carlyle claimed the land west of north 6 west; and, in April 1766, commenced an ejectment against Alexander, who appears to have recovered part of the land between north 6 and north 17 west in a previous ejectment against one of his tenants. In May, 1771, a verdict and judgment were rendered in his favor.
 
 
 14
 In the year 1774, Townshend Dade and Parthenia, his wife, instituted a suit against John Alexander for a title to the land mentioned in the bond of Robert Alexander. To this suit John Alexander filed his answer stating the death of Dade Massey leaving a son by Parthenia, her subsequent marriage with Townshend Dade, and the doubt who was entitled to the land, as the reasons for its not having been previously conveyed.
 
 
 15
 In the same year, Charles Alexander, son and heir of John, filed his answer in which he states the doubt respecting the back line, admits the north 6 west to be the present back line, and prays that, should a more western boundary be at any time established, he and his heirs might be at liberty to vary the boundaries of Parthenia's land so as to conform to such future back line.
 
 
 16
 In 1776, a deed was executed by Charles Alexander to Parthenia Dade conveying 400 acres of land according to the bond of Robert Alexander. This deed specifies no boundaries and contains no stipulation respecting the future change of the back line. It would confirm the will of Robert Alexander, if that will wanted confirmation. In the year 1779, this suit was dismissed neither party appearing.
 
 
 17
 In May, 1778, Parthenia Dade conveyed this tract of land with no other description of the metes and bounds than was expressed in the bond and will of her father, to William Hartshorne, who took possession of the land and held it according to Berry's survey, which makes north 6 west the back line.
 
 
 18
 William Hartshorne laid off the northern part of the tract from the river to north 6 west in twenty-three lots which he sold to various persons; and then, in May, 1779, conveyed the residue of the land, which incindes that in controversy, to William Harman, of Pennsylvania, by metes and bounds taking north 6 west to be the true back line.
 
 
 19
 In the year 1786, Mordecai Lewis, executor of William Harman, conveyed this land to Elisha Cullen Dick, who in 1796, conveyed eighty-three acres, the land now in dispute, to Henry Lee, who, in June, 1797, conveyed to Baldwin Dade, who, on the 29th day of December, in the year 1801, conveyed to Philip Fitzhugh, who, on the 18th of February, 1802, conveyed to Nathaniel Pendleton. In the same deed Fitzhugh conveys also to Pendleton three acres of land, other part of the tract of 400 acres, with notice that Charles Alexander claims north 17 west as the back line.
 
 
 20
 Previous to the conveyance from Baldwin Dade to Philip Fitzhugh, the said Dade had conveyed the land in controversy to Thomas Swan to secure a debt due to William Hodgson. Swan conveyed to William B. Page, in trust for Hodgson, who conveyed to Hodgson, who, in July, 1803, conveyed to Pendleton.
 
 
 21
 Soon after the decision in favor of Carlyle in May, 1771, Charles Alexander brought an ejectment for the same lands, and in 1790, a verdict was given in his favor, on which a judgment was rendered, which was affirmed on appeal in 1792. In 1796, Charles Alexander instituted a suit in the Court of Chancery in Virginia, for the purpose of altering the boundaries by which the land of Parthenia had theretofore been held, and of laying off that tract so as to extend it to north 17 west, thereby narrowing its breadth where it stretches towards the town of Alexandria, and giving it more length. To this suit, those under whom Pendleton claims, with others were made Defendants.
 
 
 22
 Charles Alexander, departed this life in the year 1806, and the suit has not been revived.
 
 
 23
 Nathaniel Pendleton being about to sell the land in controversy, tendered to Charles Alexander a deed for quieting the title; and, on his refusing to execute it, instituted a suit to compel him so to do. After the death of Charles Alexander this suit was brought against the Defendant, his widow and children.
 
 
 24
 In the Circuit Court a decree was rendered in favor of the Plaintiff, from which the Defendants have appealed to this Court.
 
 
 25
 The cause was argued last term, by SWAN and JONES, for the Appellants, and by E. I. LEE and C. LEE, for the Appellee.
 
 
 26
 SWANN, for the Appellant.
 
 
 27
 The only question is, whether the long possession according to metes and bounds, gives a good title notwithstanding the claim of Alexander to carry his back line so as to run north 17 degrees west; instead of north 6 degrees west.
 
 
 28
 The bond to convey to Parthenia in 1731-2, calls simply for the back line; R. Alexander's will in 1735, devises the land to her by the same description; and the deed of confirmation from Charles Alexander in 1776, still rofers to the back line. Whatever should be the back line of Alexander's tract, was to be the western houndary of Parthenia's 400 acres. In 1740 a suit was instituted for partition, in which Parthenia was a party. A survey and partition was made, but was not acted upon by the Court, because the parties all understood that the back line was unsettled, and the partition then made was agreed to be temperary, and to be reformed if the back line should be carried farther to the westward than north 6 degrees west. This agreement, although verbal, was binding on Parthenia, at least so far as to prevent her possession from being considered as adversary to Alexander as to that part of the land which might be taken away upon settling the back line.
 
 
 29
 There was therefore no adverse possession until 1778, when Parthenia sold to Hartshorne. From 1778 to 1796, when C. Alexander instituted his suit in the Court of Chancery in Virginia, to after the boundaries of the tract, there had not been 20 years of adverse possession. If Pendleton had looked back to his title he would have found that it was never conveyed by metes and bounds, prior to 1778, and that the question of boundary was still unsettled. He purchased while that suit was pending, and therefore must be presumed to have had notice of the claim.
 
 
 30
 E. I. LEE and C. LEE, contra.
 
 
 31
 This case is not affected by the question, which was the true back line of Alexander's land. Neither Parthenia nor those claiming under her, were parties to any suit in which that question was litigated, and cannot therefore be bound by any decision on that point. At the date of the bond, and of Robert Alexander's devise to Parthenia, he held only to the line north 6 west. The conveyance is to be taken most strongly against the grantor. In 1776, when C. Alexander made the deed to Parthenia, he held only to the same line, and it had been at that time established as his back line by a judgment in the year 1771.
 
 
 32
 If there were sufficient evidence of a parol agreement, it could be only an agreement to re-convey the land, if the back line should be settled further to the westward. Being a parol agreement to convey land, it would have been void by the statute of frauds.
 
 
 33
 If Pendleton had notice of the pendency of C. Alexander's suit in chancery to alter the boundaries, yet that suit was afterwards discontinued, and there is no evidence that Hartshorne, or those claiming under him, had notice of the claim until after they had made their purchases. Pendleton holds their rights, and can protect himself by their want of notice.
 
 
 34
 JONES, in reply.
 
 
 35
 There was nothing in the title to deceive purchasers. There was sufficient evidence on the face of the deed to show that the possession was temporary. They all refer to the back line of Howsen's patent; and every purchaser would necessarily enquire where that line was. Upon the enquiry he would find either that the line was in dispute and unsettled, or that it had been settled at north 17 degrees west.
 
 
 36
 The agreement was merely evidence of the nature of the possession, and was no more affected, in this respect, by the statute of frauds, than would be a simple declaration of the tenant, that he held not adversely to, but under, R. Alexander.
 
 
 37
 If the title is to be quieted, it must be upon the principle that long possession by certain metes and bounds, induces a presumption that some deed had been made conformable to the possession. But such a presumption is rebutted by the agreement.
 
 March 12th.
 
 38
 MARSHALL, Ch. J. after stating the case, delivered the opinion of the Court as follows:
 
 
 39
 'The being an application to restrain a person from the assertion of title in the ordinary course of judicial proceedings, the prayer of the bill ought not to be granted in a doubtful case; but if the case be a clear one, the interposition of equity is allowable; and the situation of the lend adjoining a growing city, the number of persons who are consequently interested in the settlement of the question, and the numerous titles which depend on it, give it peculiar claims to the attention of the Court.
 
 
 40
 By the laws which govern this case, a possession of thirty years under some circumstances, and of fifty years, under any, constitutes a title against all the world. The Appellee claiming under a possession perhaps from the year 1732, certainly from the year 1741, has a complete title, unless something can be alleged by the Plaintiffs in error which shall deprive him of the advantages of that possession.
 
 
 41
 It is urged that the contract of 1741, between the Alexander's and the Dade's, made the latter trustees for the former with respect to that portion of the land included in Berry's survey, which they had agreed to surrender in the event of establishing a more western back line. And that, therefore, in computing time, we must commence with the sale from Parthenia Dade to William Hartshorne, in May, 1778.
 
 
 42
 Had the land continued in possession of Parthenia Dade and her heirs, the question whether this contract was of unlimited duration, or contemplated some particular suit then intended to be brought, would merit consideration. But as the contract does not appear on the title papers, but was verbal, a purchaser for a valuable consideration could not be affected by it unless he was a purchaser with notice. Finding Parthenia Dade in the quiet and undisturbed possession of four hundred acres of land, forming a parallellogram, limited on the west by the line north 6 west, he had a right to consider that line as established, so far as respected the land of Parthenia. He was not bound to know that a private parol agreement existed, which would control the possession. This trust therefore no more passed with the land to Hartshorne, than would any other secret trust of which he had no knowledge.
 
 
 43
 The various suits which have been instituted by, and against the ancestors of the Appellants cannot affect this cause, A suit not prosecuted to a decree or judgment is not constructive notice to a person not a pendente lite purchaser; and were the law otherwise, those suits, until that instituted in 1796, would convey no notice of the private agreement made in 1741. A knowledge of the suits therefore would not imply a knowledge of the trust; and possession for fifty years, though with knowledge of a better title, if adversary, constitutes a good defence against that title.
 
 
 44
 In 1796, Charles Alexander instituted a suit against sundry persons claiming the land in controversy for the purpose of altering the boundaries which had been held by Parthenia, and those claiming under her, from the year 1732, and which had been surveyed under an interlocutory decree made by the Court of Chancery, in the year 1741. In defending themseives against this claim, the purchasers of the land had a right to unite the possession of Parthenia Dade to their possession, without being affected by a secret trust of which they had no notice. If upon the trial of that suit a possession of fifty years could not have been established, and if the Court should have been of opinion that this was not a case in which an adversary possession of thirty years would have constituted a bar, the merits of the title would have been necessarily investigated. But if Charles Alexander had permitted that suit to be dismissed, and had filed a new bill, he would not have been at liberty, in the computation of time, to avail himself of the pendency of the former suit, unless he could have connected the two suits together. The law is the same where a suit terminates by abatement and is not revived, such a suit takes no time out of the act of limitations. The title of Pendleton therefore has from that act all the benefit which can be derived from a possession from the year 1741, when a possession ostensibly adversary by metes and bounds unquestionably commenced, to the institution of this suit in the year 1806. The deduction which the laws of Virginia make from all computations of time in consequence of the war of the revolution, will not be sufficient to take this case out of the act of limitations. The Appellees title, being secured by a possession of more than fifty years, is unquestionably good, and it is proper that the doubts which hang over it, should be removed. There is no error in the proceedings of the Circuit Court and the decree is affirmed.