Mr. Chief Justice Marshall
delivered the opinion of the Court.
This is a writ of error to a judgment rendered by the Circuit Court for the District of Pennsylvania, in favour of Penn’s lessee, who was plaintiff in a. writ of ejectment. The case depends on a bill of exceptions taken to the. opinion of the Court, expressed in a charge to the jury,
On the 4th of March, in the year 1681, Charles II. granted to William Penn, the ancestor of the plaintiff in the Circuit Court, that tract of country which now constitutes the State of Pennsylvania, By this grant, the property in the soil, as well as in the right of government, was conveyed to William Penn and his heirs, in fee simple,
. The grant contains special powers to erect manors* and to alien the . lands, with liberty to the *257 alienees to hold immediately of the proprietor and his heirs, notwithstanding the statute of quia emp-tores. On the 11th of July, in the same year, William Penn, having interested many persons in his grant, agreed with the “adventurers and purchasers” in England, on “ certain conditions or concessions,” which being for their mutual advantage, were to be obligatory in the.future management of the property and settlement of the province. The 9th of these conditions is, that “ in every 100,000 acres, the governor and proprietary,; by lot, re-serveth ten to himself, which shall lie but- in one place.”
It would seem as if this article should be construed as restraining the power of the proprietor. Being the absolute owner of the soil, it was in his power, independent of contract, to sell, or not to sell, any part of it. But, as the valute of the lands must necessarily depend on the. progress of settlement, it was obviously the interest of the great purchasers and adventurers, as well as of the proprietor, that he should open the country generally to emigrants. It was also the interest of the proprietor, to make large reservations for his private use, that he might avail himself of the increased válue to be derived from settlement. To prevent his checking the advance of the settlements by un-reasonablé reservátions, this article fixes the proportion of. land which he may take out of the general stock offered to the public. The great mass of land was in the market, to be acquired by any adventurer, at a given price; but out of this mass, *258 the proprietor reserved for himself one tenth, to lie in bodies of not less than 100,000 acres,
The survey reserving these lands .for his own use,whether distinguished by the common appellation of manor, or. by any other, name, was not to give any new title to the proprietor. The sole effect was,, to separate the land so surveyed from the common stock, and to withdraw it from the market. The survey was notice to all the world, that the land was not . subject, to individual appropriation on the common terms, but could be acquired only by special contract.
It was not the intention, because it could not be the interest of the proprietor, to continue all these manors, or reserved lands, as unoccupied wastes; but to sell them at such advanced price as the continuing progress of settlement and increase of population would justify. The lands reserved, and the lands not reserved, belonged equally to the proprietor, and were equally for sale. The only difference between them was, that the lands not reserved, were offered to the public at a fixed price, while those which were reserved; could be acquired only by special agreement. This difference produced the distinction, of which we have heard in. argument, and which seems to have been well understood in Pennsylvania, between warrants on the common terms, and warrants to agree.
In the year 1762, a warrant was issued for the survey of the manor of Springetsbury. This warrant recites a former survey of the same land, in 1722, as a manor, states the general outlines of such former survey, and directs a resurvey. This *259 resurvey was made, and returned into the land office, in the year 1768, where'it has remained ever since, among the documents of the land titles in Pennsylvania.
This resurvey included the lands of the plaintiffs in error, which were held under warrants,, of which the following has been selected as a specimen :
“ Pennsylvania, ss.: By the Proprietaries.
“Whereas, Bartholomew Sesrang, of the county of Lancaster, hath requested that we would grant him to take up two hundred acres of land, situate between Codorus creek and Little Cone-waga creek, adjoining the lands of Killian Smith and Philip Heintz, on the west side of the Susque-hannah river, in the said county of Lancaster, for which he agrees to pay to our use the sum of fifteen pounds ten ^hillings, current money of this province, for each hundred acres ; and the yearly quit-rent of one halfpenny sterling for every acre thereof.
“ These are, therefore, to authorize and require you to survey, or cause to be surveyed, unto the said Bartholomew, at the place aforesaid, according to the method of townships appointed, the said quantity of 200 acres, if not already surveyed or appropriated, and make return thereof into the secretary’s office, in order for further confirmation; for which this shall be your sufficient warrant: which survey, in case the said Bartholomew fulfil, *260 the above agreement.within six months from the date hereof, shall be valid; otherwise void.
“Given under my hand and seal of the land office, by virtue of certain powers from the said Proprietaries, at Philadelphia, [i.. s.] this eighth day of January, Anno Do-mini one thousand seven hundred and forty-two. George Thomas.
“To Wm. Parsons, Surveyor GeneraV
In virtue of this warrant, a survey of the land claimed by Caleb Kirk, one of the, plaintiffs in error, was made on the I2th of October, 1747, in favour of Jacob Wagner, the then holder of the warrant, by various mesne transfers. The title was regularly deduced by various conveyances, from Wagner to Kirk, accompanied with possession.
No grant ,has been issued for the lands. . Ten pounds, in part of the consideration, were paid, about the date of the warrant, and' there is no proof of the payment of the residue.
It appears to have been the common usage, for the proprietaries.to give great indulgence to the purchasers of lands, for the purchase money. Although, by the terms of the contract, the survey was declared to be void,- unless the agreement were fulfilled in she months, yet the proprietaries appear not to have been in‘the practice of availing themselves of this condition. Large arrearages of purchase money remained due after the surveys were made, which, as the grants were withheld, were debts upon interest, secured in the *261 best possible manner. This credit was mutually advantageous. By accelerating the settlement of the province, it was beneficial to the proprietaries; and the purchaser could terminate it whenever it ceased to be beneficial to himself.
Until the war of our revolution, this state of thirgs appears to have continued. The settle-, ments advanced with great rapidity. Manors were surveyed, lands were Sold, and large arrearages were due for purchases made, both within and without the manors. The only distinction appears to have been, that the reserved lands were sold by special contract, and the lands not reserved, were sold at stated prices.
When the war of our revolution commenced, the proprietary went to Great Britain, and. was, consequently, to be considered as a British subject, not as an American citizen. The right to confiscate his property, or to leave it untouched, was in the government of Pennsylvania. The Legislature of that State, for reasons satisfactory to itself, took a middle course. In 1779, an act was passed, entitled “An act, for vesting the estate of the late proprietaries of Pennsylvania in this Commonwealth.” This ejectment was brought in the year 1819.
On the trial of the cause, the question, whether the land in controversy was included within the lines of the manor of Springetsbury, as surveyed under the warrant of 1762, was left to the jury-, who have found that it was included within them. The opinion of the Judges who tried the cause, was, that if the land was within those finés, the *262 right of the plaintiff, in that Court, was excepted out .of the general. operation of the act of 1779, and was not vested in the Commonwealth.
To this opinion an exception was taken, which has been supported in this Court by arguments, in part, applicable to warrants of every description ; and, in part, to those only which were issued on the common terms.
In that part of the argument which applies to all warrants, the plaintiffs in error contend, that the 5th section of the act of 1779, vests all the rights of the proprietary in the commonwealth, with the exception of those only which are reserved by other sections of the same act; and that the right to the purchase money, which then remained unpaid, is comprehended within the general words of the 5th section, and not excepted in any other section.
In considering this argument, it will be necessary to examine the 5th section critically, and to ascertain its extent with precision.
It enacts, “ that all and every the estate, right, title, interést, property, claim,, and demand, of the heirs,” &c. “ or others claiming as proprietaries of Pennsylvania,” “ to which they, or any of them, were entitled, or which to them were deemed to belong on the 4th day of July, 1776, of, in, or to, the soil and land contained within the lilmits of the said province,” “ together with the royalties, franchises, lordships, and all other the hereditaments and premises comprised, mentioned, or granted in the same charter or letters patent of the said King Charles the second, (ex *263 cept as hereinafter is excepted,) shall be, and they are hereby vested in the Commonwealth of Pennsylvania.”
The first part of tjie description of that which the Legislature intended to vest in the Commonwealth, comprehends all the rights of the proprietaries in the “ soil and land” of Pennsylvania, but comprehends nothing else. It would not, we presume, be contended, that this part of the description would embrace the purchase money due'for land, if any such case existed, which had been sold and conveyed by the proprietary, and for the purchase money of which a bond had been taken. This act. could not, we presume, be pleaded in bar to an action of debt on a bond given to secure the. payment of money due for land. This section, at least, is directed against the landed estate of the proprietary, not against his claims for money.
If this first part of the description does not reach debts on account of land sold, neither does the second. It seems almost useless to observe, that a debt for land sold, is neither “ a royalty, franchise, lordship, or other hereditament;” and that it forms no part of the premises granted in the charter.
The.subsequent part of the section vests nothing. It contains only a more ample description of the absolute and unqualified manner in which the property, previously described, is to vest in the Commonwealth. It is freed and discharged from every incumbrance, claim, or demand whatsoever, as fully as if the said charter, &c. “ and all other *264 the estate, right, and title, of the said proprietaries, of, in, and to the same premises, were herein transcribed, and repealed
It is unnecessary to comment on the particular words of the legislature, which are regularly and technically applicable to the charter, because it is too obvious for controversy, that the whole design and effect of the clause is to show, that the property described in the' preceding confiscating clause, is to vést in the Commonwealth, freed from- every trust, limitation, or incumbrance whatsoever. But the property comprehended in the confiscating clause, was land only ; and the land of the proprietaries, together with the royalties, &c. annexed to it.
If, then, the particular subject of this-controversy be within thé 5th section of the act of 1779, it is because it is to be considered as land to which the proprietaries were entitled. If not so considered, the 5th section does not vest it in the Commonwealth. If it be So considered, the next inquiry is, whether it be within the exceptions maide by the act.
The 8th section provides and enacts, "that all and every the private estates, lands and hereditaments of any of the said proprietaries, whereof they are now possessed, or to which they are now entitled, in their private several right or capacity, by devise, purchase or descent; and likewise all the land called and known by the name of ‘-the proprietary tenths,’ or manors, which were duly surveyed and returned into the land office, on or before the 4th day of July, in the year 1776, toge *265 ther with the quit or other rents, and arrearages of rents, reserved out of the said proprietary tenths, or manors, or any part or parts thereof, which have been sold, be confirmed, ratified and established forever, according to such estate or estates therein, and under such limitations, uses, and trusts, as in and by the several and respective reservations, grants, and conveyances thereof, are. directed and appointed.”
This section reserves the private estates of the proprietaries, “and likewise all the lands called and known by the name of ‘the proprietary tenths,’ or manors, which were duly surveyed and returned into the land office, on or before the 4th day of July, in the year 1776.”
That the manor of Springetsbury was dulys ur-veyed, and returned into the land office before the 4th of July, 1776, has not been controverted in this Court, so far as respects land, not sold before the resurvey, which constitutes the question now under particular consideration; and that the land for which this ejectment was brought, lies within the survey describing the external boundaries of that manor, is established by the verdict-of the jury. The dilemma, then, presented to the plaintiffs in error, is a fair one. The legislature did or did not consider the right reserved by the proprietary to re-enter and avoid the warrant, or to re-grant the land, as an estate or interest in -the soil, as land, even before such right was asserted. If it was so considered, and, as land, was confiscated by the 5th section, then it was likewise so considered iii the 8th section: and, as land, was excepted and *266 saved to the proprietary. If the Legislature considered this right merely as a claim to money, secured on the land, then it is not confiscated by the 5th section, but remains to the proprietor, unaffected by it. We can pérceive no principle of sound construction, by which, comparing the 5th and 8th sections with each other, the 5th shall, so far as respects land in manors, be made more comprehensive than the 8th ; no principle, by which the confiscating clause shall be made broader than the saving clause.
. It was necessary to reserve the quit-rents expressly in the 8th section) because they may, on fair construction, be understood to be comprehended in the 5th section; and, consequently, to be vested in the Commonwealth, if not expressly éx-cepted. The quit-rents would not, indeed, be confiscated by that part of the section which relates to soil or land; but may very well pass under the words “royalties, franchises, lordships, and all other the hereditaments and premises comprised, mentioned, and granted in the same charter) or some of them.” The quit-rent is a hereditament, reserved under the very words of the charter, and annexed to the seignory. It would not be absolutely improper, to term it “royalty,” since similar reservations are generally to be found in grants made to individuals in the royal governments. The express exception of quit-rents, therefore, without mentioning the arrears of purchase money, furnish no argument in favour of the plaintiffs in er-for. The qóit-rents were excepted in the 8th section. because they would, if not excepted, have *268 objects not fairly embraced by its terms, but its whole spirit is in opposition to the idea. Taking this view of the subject, we should be astonished, indeed, to find, that the same Legislature which left untouched the accruing quit-rents on the lands sold within the manors, as well as those which were in arrear, should seize the arrears of purchase money within the same manors ; that the Legislature should spare, so far as respected the manors, that which partook, in its nature and essence, of the proprietary character, and should seize that which was, in its essence, private debt, and was distinguishable from other private debts in nothing but in the manner in which it was secured.
The 5th and 8th sections, then, leave the arrears of purchase money due for land sold within the manors, precisely in the situation, in which the act found them.
Both parties have resorted to the 9th and 10th sections of the act.
The 9th section discharges all the lands held under the late proprietaries, not within the tenths or manors, from quit-rents, or arrearages of quit-rents, and arrearages of purchase money. And the 10th section provides “ that the said Arrear-ages of purchase money, other than for lands within the said tenths an9 manors, shall be accounted to be due and payable to the Commonwealth.”
No man who reads this act, will be at a loss for the motive which induced the draftsman of the bill to introduce the 9th section. The 5th and 8th taken together, would leave all the' lands of *269 Pennsylvania still chargeable with quit-rents, and would vest those not within the manors, in the Commonwealth. It was, the intention of the Legislature to discharge the. lands not within the manors, from this burthen, and a section was necessary for that purpose. Read the section, omitting the words respecting the purchase money of lands not within the manors, and it expresses, with plainness and perspicuity, the ideh which has been suggested. All who are acquainted with our course of legislation, know, that after a bill has been framed, and the language adapted to its objects, amendments are sometimes introduced into, it, in a late stage of its progress, without being sufficiently cautious to change the language which was adapted to the original matter, so as to fit it to the new matter contained in the amendment. This can alone account for the perplexity and confusion of the 9th and 1 Oth sections of this act. The 9th section, which is so perfectly clear without the words respecting the arrearages of purchase money for lands not within the manors, is so embarrassed and confused with them, as to be scarcely intelligible; and the whole office of the 10th section is, to vést in the Commonwealth a part of that which the 9th had abolished. Courts must, however, giye to these sections that interpretation which seems best to comport with the intention of the Legislature.
The 8th section had confirmed to the proprietors, for ever, the quit-rents reserved in the manors. The 9th, which was intended to abolish all qiiit-rents on all ether lands, commences with *271 only. When, then, we come to the enhcting part of the clause, which ordains that the “ same lands and other hereditaments, shall be held free and discharged therefrom, and from the payment thereof, for ever;” and ask, what are- the same lands ? and from what are they discharged ?' the Only answer which can be made to the question is; that “ the same lands” are lands not within the manors;, and that the discharge is from all quit-rents other than the quit or other rents reserved within the proprietary tenths or manors, before mentioned,” “ and arrearages of purchase money for lands not within the tenths or manors afore said.” That the Legislature deemed it necessary, by one of these sections, to take from the proprietaries the arrearages of purchase money not within the manors, and . by the other, to vest them in the Commonwealth, is proof that this was not done by the 5th.,
The inference to be drawn, as we think, from the 9th section, that the Legislature never lost sight of the distinction -set up between manors and the general territory of the Commonwealth, is strengthened by the language of the 10th section,. which provides and enacts, " that,, in order to preserve equality among the purchasers of land under the said late proprietaries, the said arrears of purchase money, other than for lands within the said tenths and manors, shall be accounted to be due and payable to the Commonwealth.”
Now, if the Legislature had supposed itself, by the preceding section, to have abolished ail the arrears of purchase money due from lands within *272 the manors, how would it “ preserve equality among the purchasers,” to coerce the payment of the purchase money for lands without the manors, tQ t¿e Commonwealth ? Or, what motive can be assigned for discharging those within the manors from paying for their lands» and requiring payment from those without the manors. It would be a caprice for which it would be impossible to account.
Where the language of the Legislature is clear, Courts cannot be permitted to assume an intention repugnant to that language, because it imports what they think unreasonable; but words are not to be forced out of their natural meaning, to produce what is unreasonable, if not absurd.
The plaintiffs in error also rely on the 6th section of the act establishing a land office, passed in 1781, as amounting, unequivocally, to a confiscation of the rights of the proprietary in the land in contest.
This proposition is sustained, by applying to all lands, words which are, indeed, general in themselves,. but which are, obviously enough, used by the Legislature with reference to particular lands, the right to which was vested in the Commonwealth by the act of 1779. .
This act does not purport io be an act of confiscation, but an act for opening a land office for the lands of the Commonwealth. It does not purport to be an act-of acquisition, but of disposition of that which had been, previously acquired. It commences with a recital, that “ many of the lands in the State, heretofore taken up,” &c., *273 "'are yet unpatented, and the purchase mouoy, and arrearages of purchase money, thereon due, are vested in the Commonwealth;” “ and the owners and holders of süch rights, since the shutting up of the land office, have not had it in their power'to pay in the purchase money and obtain patents: for remedy whereof, be it enacted, that an office be erected,” &c.
The subsequent regulations, then, respecting the payment of the purchase money,'were intended for such purchase money only as was already vested in the Commonwealth; and the un-patented lands referred to, are those only, the purchase money due on which was then vested in thp Commonwealth. It is important, too, in the construction of this act, to recollect that the framers of the act of 1779 could not have intended any interference, by means of a land office, or otherwise, with the manors. They remained the property of the proprietaries, who were themselves to receive the arrears of purchase money, and to complete the titles. The whole act being framed for the property of the Commonwealth, the general words of the 6th section must be understood to be limited to the subject matter of the act; that is, to the property of the Commonwealth.
The act directs, that patents sball.be issued for lands for which the parchase money shall be received: and the 16th section directs, that the land, sp granted, “ shall be free and clear of all reservations and restrictions, as to mines, royalties, quit-rents, or otherwise.” Now, the act of 1779 *274 expressly reserves for the proprietors the quit-rents within the manors. This act, then, cannot be construed to authorize the issuing patents for janc|s within the manors, unless it be also construed to be a confiscation, by implication, of property expressly reserved for, and vested in individuals, by a preceding act of the Legislature. This construction, to be justified, must be unavoidable.
But the 12th section appears to the Court to deserve some consideration. That section declares, “ that nothing in the act shall be construed to extend to lands, not granted in the usual forms of the land office.”
There were, then, lands in Pennsylvania, “ not granted in the usual forms of the land office.”
As this case comes on after a general verdict, on an exception to a charge given by the Court to the jury, it is incumbent on the person taking the exception, to show that the charge is erroneous. If it comprehended this act, of which the Court is not satisfied, still it is incumbent on the exceptor to show that lands within manors were “ granted in the usual forms of the land office.” This fact is not shown.
The act of 1783 is obviously limited to the same subject to which the act of 1781 applies. All arguments founded on this act are liable, too, to .this additional objection. It was enacted after the treaty of peace, when the power of the State Legislature over the estate of William Penn, real and personal, had ceased.
We come now to that part of the argument which *276 others within that territory, but left such contro versy to be decided between the parties, as if the law had never been passed. The act is simply an adjustment between Penn and the Commonwealth. It refers to a fact of public notoriety, as marking the lines of division between them. That fact is. a survey, duly made and returned into the land office, before the 4th of July, 1776. The survey must be understood as one entire thing, describing the particular tract of country surveyed, and the words “duly made,” mean, made according to the forms prescribed by law or usage. It was. very well known, that, within these surveys, some lands were sold, and some were not sold. On all which were sold, quit-rents were received, and on some of them, the purchase money was still due. With the land, if not sold, with the quit-rents and purhase money, if sold, the Legislature, as has been already shown, declares its purpose not to interfere. There is nothing' in the language, nor is there any thing in the character of the transaction, which would lead to the opinion that the Legislature. intended To discriminate between the different rights of the proprietaries within the manors. The hand of government is not laid upon.the manors, and all the rights , of the. proprietaries within those boundaries, whether to land, purchase money, or. quit-rents, remain untouched. There can be no conceivable reason for supposing, that the Legislature meant to inquire into the dates of the warrants evidencing the sale of lands, while the right to sell was acknowledged, and to discharge one contract of sale within the untouched bounda *277 ry, while another remained valid. The words make, no such distinction, and we can perceive nothing in the nature of the property which will justify the Court in making it.
If we trace these words, “manors,” and “proprietary tenths,”- to their first use, we shall find reason to confirm, not to change, the sense in which we suppose them to have been used in the act of 1779-
By the 19th section' of the charter, license is granted to William Penn, and his heirs, “to eréct any parcels of land, within the province aforesaid, into manors.” There is no restriction on this power, which confines its exercise to lands which are vacant at the- time. There was, then, no want of power iii Penn to comprehend'within a manor lands which were actually sold. The rights of the purchaser, the tenure by which he. held his property, could not be changed, nor would they be changed, by including his land within the survey of a manor;
The proprietary tenths originate in the “conditions or concessions agreed on between William Penn and certain adventurers and purchasers, on the 11th of July, 168Í . The 9th condition, or concession, is: “In every 100,000 acres, the governor and proprietary, by lot, reserveth ten b-himself, which shall lie but in one pláce.”
Now, it is very apparent that, supposing this.stipulation to be a fundamental law and to enure to the. benefit of all the inhábitants, it can only restrain the proprietary from reserving more than ten out of every 100,000 acres of land, and compel him to lay it off in one body. If within any survey *279 evidence given in the cause, that an agreement was éntéred into, in 1736, between the proprietary and a number of the inhabitants, by which he engaged to make them titles for certain specified quantities of land in their possession, on the common terms. This agreement is stated to havé. been afterwards carried into execution. The contract, as stated, contains unequivocal proof of having been made under the idea that the survey of 1722 was valid, that it related to lands within the lines of that survey, and that the land within its lines was considered as a manor. That survey may not have been attended with those circumstances which would bring it within the saving of the act of 1779, and, certainly, in this, cause,-' is not to be considered as a valid survey of a manor. It was, nevertheless, believed, in 1736, by the parties to this contract, to be a manor; and those proceedings which took place respecting lands within it, are, consequently, such as might, take place respecting lands within a manor. We find sales of land made to fifty-two persons, upon the common terms, and grants made to them according to contract. When the final survey was made, comprehending these lands as being part of the manor of Springetsbury, were they less a part of that manor because they were granted as a part of it before that survey was made? When, in 1779, the Legislature excepted from confiscation the quit-rents “ reserved out of the said proprietary tenths or manors,” is it credible that they intended to create a distinction, never heard of before, between the quit-rents on lands lying *280 within the lines of the manor, and sold as part of the manor, to depend on the terms or the time of the grant ?
The defendants in tjie Circuit Court gave in evidence, fifteen instances of lands lying within the manor being settled for on the common terms. Were these lands excluded from the manor by being so settled for? Did the Legislature of 1779, when about to save for the proprietaries the quit-rents reserved out of manors or proprietary tenths, or out of land commonly called and known by the name of manors or . proprietary tenths, which were duly surveyed and returned into the land office, on or beforo the 4th of July, 1776, fix its mind on the survey to which reference is made, or on the dates and terms of the grants made for lands within the Purvey? If on the survey, then the language expresses the intention; if some other distinction was designed,, it is strange that no words were inserted pointing to such distinction. The Legislature intended to confiscate the estates of the proprietaries in part, and in part only. The line of partition between, the Commonwealth and the Penn family, was to be drawn. It was the province of wisdom and of justice to make this line a plain one. It was proper that the Commonwealth, and Penn, and the people of Pennsylvania, should be able distinctly to discern it. If the lines of the manors, as surveyed and returned in the land office, before the 4th of July, 1776, constitute the dividing lines between.the parties, they are plainly and distinctly drawn. If some *281 imaginary distinctions are to be made between the lands comprehended within those lines, or the quit-rents reserved on those which had been sold, the whole certainty of the division is lost, unless some other line, equally plain, equally rational, and equally justified by the words of the act, can be substituted. Is this practicable in the case before the Court? Extensive sales'were made in a tract of country, supposed by the seller and the purchaser to be a manor. Other sales were made, containing in the contracts no intrinsic evidence that the parties understood the lands to be within a manor. The purchase money, in both cases, is paid, and deeds are made, reserving the usual quit-rents. To ascertain the real boundaries of the manor, to make a legal survey of it, if one had not before been made, a warrant of resurvey is issued, and a survey made and returned into the land office, comprehending both these classes of lands,, with others which were at the same time vacant, as being within the manor. When the Legislature saves to the proprietaries the quit-rents out of lands sold within the manors, can a distinction have been intended between those lands which were sold as,par.t of the'manor before, and those which were Sold after the resurvey? If it be assumed, where the warrants contain no evidence of being intended for manor lands, that the parties or the proprietaries were ignorant of their being comprehendéd within a manor, what difference, in reason, can this make ? The larfds were equally liable to quit-rents in the one case and the other. They were equally within a manor, - ‘ *282 whether known or not known to be within it. Could the Legislature have a motive in the one case more thdn in the other, for abolishing these quit-rents? If the motive existed, it would be shown in. the language adopted. But the search for it ini the language of the Legislature, would be as fruitless as in the reason of the cáse. The Court cannot set up this distinction.
If the word manor, when used as describing territory within which quit-rents are saved, comprehends lands sold before the resurvey, then the same word, when applied to the arrears of purchase money, retains the same meaning.
It has been urged in argument, that the Legislature intended clearly to distinguish between the rights of Penn, as an individual, and his rights as proprietor. The first were reserved; the last were confiscated. This distinction, so far as respects the subject of the present controversy, is not to be found in the law. • The 8th section confirms to the proprietaries all their private estates, “ and likewise all the lands called and known by the name of the proprietary tenths or manors.” These proprietary tenths or manors, then, did not compose á part of, but were in addition to, their private estates. They were held too by precisely the same title by which other lands in Pennsylvania, not sold nor reserved, were held . Nor was. there any new modification of that title. They were withdrawn from the mass of property offered for sale on the common terms; but were still held by Penn, solely as proprietor under the charter. The quit-rents, too, were clearly an appendage *283 to the original grant, retained on the lánds which Were sold, and retained by Penn in his character as proprietor. Yet these are expressly saved to him. There is, then, in the act of 1779, no intention to make the private and proprietary rights of Penn the criterion by which the Hné of partition between him and the Commonwealth should be ascertained; but there is a clear intention to divide his proprietary estate, and to make his surveys of manors the criterion by which this line of partition should be ascertained.
This result is, we think, very clearly produced, so far as respects the soil, by the 5th and 8th sections; and is, we think, produced not less clearly with respect to the arrears of purchase money, by the 9th and 10th sections. Strike out those sections, and there is nothing in the act which can reach the • arrears of purchase money, within or without the manors. They would, like other debts, remain the property of the creditor. The 9th section expressly abolishes “ the arrearages of purchase moneys for lands not within the tenths or manors.aforesaid;” and if, as we think, the tenth, or manor, was in the minds of the Legislature, described by a survey thereof, made according to law or usage, and returned into the land office before the 4th of July, 1776, then the lands on which the arrearage of purchase money is claimed, in this case, are within one of the aforesaid tenths, or manors.
We think, then, that the lands, or the purchase moneys which the- plaintiffs in the Circuit Court *284 claim in this case, are riot confiscated by any act of thri State of Pennsylvania.
Before we take leave of the act .of 1779, it may , . .. , , . . . be proper to inquire, whether it has any operation on the lands lying within the manors, and which had been sold, but not granted, the terms of sale not having been complied with. It will be recollected, that, those on whose property this law acted, were the subjects of an enemy, and that the Legislature possessed full power over their estates. Haying the power to confiscate absolutely, they might modify that power in its exercise, as to them might seem proper. The 7th section provides and.eriacts, that all the rights, &c. which were derived from the proprietaries, or to which any person other than the said proprietaries were entitled, “ eithér in law or equity,” by virtue of any deed, patent, warrant or surrey, of, in or to any part or portion of the lands contained within the limits of this State, or by virtue of any location filed iri the land office before the 4th of July, 1776, shall be, and they are hereby confirmed, ratified, and established for ever, according to such estate or estates, rights or interests, and under such limitations or uses as iri and by the several and respective grants and conveyances thereof are directed and appointed.
This section comprehends all the lands within the State, whether within or without the manors, to which any individuals had derived a title from the proprietaries, either in iaW or equity, by virtue of any deed, patent, warrant or surrey, and confirms such title according to the estate, right or in *285 terest conveyed. That the section operates alike on lands within and without the manors, and that it confirms titles under warrants or surveys, for which the purchase money has been paid, are certain. It is equally certain, that it does not interfere with the arrears of purchase money which may still be Jue, because that whole subject is taken up and disposed of in the 9th and 10th sections of the act. The doubt is, whether it has any influence on any lands, the purchase money for which had not been paid ; and if any, how it affects the title to such lands.
The right of re-entry was reserved as a security for the payment of the purchase money, but does not appear to have been exerted, and was probably considered in the light of a mortgage, to be used merely as the means of enforcing the fulfilment of the contract, not as absolutely terminating the estate. That the proprietaries looked on for a great number of years, and saw lands held under warrants void on their face, for the failure to fulfil the contract within the specified time of six months, and never, in a single instance, so far as appears in the^ase, or has been alleged in argument, attempted to avoid the estate, would certainly, afford a strong equity to such purchaser against the proprietary, should such an attempt be made. And that ejectments were maintained on such titles, is also evidence of the opinion entertained of them in the Courts of Pennsylvania. It seems to havfe been understood by all, that the proprietary was to avail himself of the condition in the warrant, for no other purpose than to coerce the payment of the’ *286 purchase money. This became, from usage, a kind of tacit agreement, which their real interest required all parties to observe. Yet, when a new state of things was introduced, it was natural for that numerous class of purchasers, who had not paid up the whole of the purchase money, to be uneasy at the hazard in which their titles were involved ; and their representatives would, very naturally feel disposed to quiet their minds'on this interesting subject. It would not be unreasonable, to suppose the existence of a disposition to make the contract expressly what it was understood to be, and to do away the forfeiture, except as a mode of enforcing payment of the arrears of purchase money. The confirmation of titles, by their own terms void, for non-payment of the purchase money, accompanied with the preservation of the right to the purchase money, admits of the construction, that the clause of forfeiture* may be used to enforce the payment of those arrears, but notas extinguishing the estate. At all events, this section has the same application to lands within, as to lands without the manor; and the construction it has received with respect to the one, may serve as a rule for the other.
The next exception to be considered, is to that part of the charge, which declares the act of. 1705, commonly called the seven years law, tó be. inapplicable to the case. That act enacts, “ that seven years quiet possession of lands within this province, which were first entered on upon an equitable right, shall for ever give an unquestionable title to the same against all, during the es- *287 lato whereof they are or shall be possessed, except in cases of infants,” &c.
It has been contended, that this act is merely retrospective; and, in support of this opinion, it has been said, that for more than one hundred years it has never been resorted to in the Courts of Pennsylvania.
To this argument it is answered, that the language of the act is prospective,. that it purports to be an act of limitations, that it is found among the printed statutes of Pennsylvania, and that its operation has never been denied, so far as we are informed, in any of the Courts of that State. During the irregularities which take place in the first settlement of a country, an act of limitations is peculiarly desirable, and it would be strange if Pennsylvania should have remained entirely without one. The 16th section of the laws agreed upon in England, enacts, “ that seven years quiet possession shall give an unquestionable right, except in cases of infants,” &c. An act of the same importas to possession, without any exception in favour of infants and others, was passed in 1700, biitwas repealed in England, in 1705, in which year the act. was passed which is now under consideration. The people of Pennsylvania had one uniform and constant wish on this, subject. Neither the 16th section of the laws agreed on in England, nor the repealed act of 1700, can be considered as retrospective; and there is some difficulty in giving this construction to the act of 1705. But, the Courts of Pennsylvania having never considered this act as having the effect of *288 an act of limitations, this Court is not inclined to go further than they have gone. If, however, it were tó be so considered, it must be governed by those rules which apply to acts of limitation generally.
One of these, which has been recognised in the Courts of England, and in all others where the rules established in those Courts have been adopted, is, that possession, to give title, must be adversary. The word is not, indeed, to be found in the statutes ; but the plainest dictates of common justice require that it should be implied. It would shock that sense of right which must, be felt equally by legislators and by Judges, if a possession which was permissive, and entirely consistent with the title of another, should silently bar that title. Several cases have been decided in this Court, in which the principle seems to have been considered as generally acknowledged;a and in the State of Pennsylvania particularly, it has been expressly recognised. To allow a different construction, would be to make the statute ' of limitations a statute for the encouragement of. fraud — a statute to enable one man to steal the title of another by professing to hold, under it. No. laws admit of such a construction.
The true question then is, whether the occupancy of those who held under these conditional warrants, was consistent with, or adversary to, *289 the title of the proprietaries ? Upon the answer to this question, it seems difficult to entertain a serious doubt. It is reasonable to suppose that the practice of selling lands on credit, and of issuing warrants in the form of that which is inserted in this ease, and of holding the legal title to secure the payment of the purchase money, prevailed from the first proceedings under the charter, until the declaration of independence, a period of near one hundred years. In the particular case before the Court, credit was given from the year 1742; and we are not informed, and, consequently, have no reason to suppose, that this indulgence was singular. The legislation of Pennsylvania on the subject, justifies the contrary opinion; for we perceive among their printed statutes, several of a late date, giving farther time to pay in the purchase money for lands sold before the 10th of December, 1776. These acts of farther indulgence, continued for such a length of time, furnish strong evidence that the cases were very numerous to which those acts would apply; and show, too, that in the opinion of the Legislature, no act of limitations had barred the claim. Now, this practice, in which the proprietaries, and a great portion of the population of Pennsylvania, concurred, is incompatible with the idea that the title of the purchaser became adversary to that of the proprietary, within six months after the date of the warrant of survey. In the case before the Court, the survey was made, in fact, upwards of five years after the date of the warrant. Is it conceivable that the surveyor, who *290 was an agent of the proprietary, would have made the survey, had he supposed it to confer a title adversary to that of his principal? a title which would enable the holder, by remaining quiet only one year and. three months longer, to set the proprietary at defiance, and to hold the land discharged from the contract by which it was acquired. The very practice of holding back the title, and of giving Such extensive indulgence for the payment of the purchase money, seems to demonstrate a general opinion, that, so long as this state of things continued, the title. to .the land was still in the proprietary, and the purchaser acknowledged his title. The occupation of the purchaser was with the consent of the proprietary, and, consequently, not hostile to,,his rights. The proprietary permitted the purchaser to hold the land, subject to his claim to the purchase money; and the. purchaser held under the admission, that the land remained liable to the purchase money, and that the proprietary might, at any distance of time, assert his title to it, so far at. least as to secure his purchase money. There seems to have been a mutual, understanding and a mutual confidence between the parties. How far. the proprietary may have had it in his power to violate this confidence, by seizing the land, and refusing to convey it on a tender, of the residue of the purchase money, is a question which does not appear ever to have been determined, or ever to have, occurred. But, certainly, during this state Of things, the purchaser could not be considered *291 as holding a possession adversary to the title which he acknowledged.
It has .been contended, that the survey of the manor was a determination! of the estáte under the warrant, and the assertion of an adversary title, from which time the act of limitations began to run.
There is certainly nothing in the fact itself, which supports this -proposition. All the transactions of the parties contradict it. There is no fact which shows a disposition in the proprietary to reenter on any lands for which a warrant had previously been granted ; nor is any case of such reentry shown, from the first settlement of Pennsylvania. Several instances are mentioned, of grants completed on the common terms, within the manor of Springetsbury, while it was consideréd by¿the parties as a manor.. No inference, then, is to be drawn from the facts in the case, favourable to the conclusion, that the survey of a tract of country as a manor, was considered as determining the estates created by surveys on warrants previously issued, the conditions of which had not been fulfilled by the purchasers. This must be a.conclusion of law, from the single act of survey, so inflexible as not to'be influenced by the intention with which that act was performed, and the opinion prevailing at the time, as attested by usage, or. the argument cannot be sustained.
But how is this conclusion of law to be supported ? The survey of a large tract of land cannot b& considered as an entry on a smaller tract within its lines, as an ouster of the occupant, or even as a *292 trespass on him. How, then, can such survey be considered as having any legal effect different from the intention with which it was made ? It is indispensable to the argument, to maintain that the mere act of survey does, of itself, in point of law, show an intention inconsistent with the continuance of any conditional estate, within the .limits of the manor. This the plaintiffs in error have endeavoured to maintain ; and for this purpose have contended, that a new title, which they call the “ manorial title,” and which they say is distinct from the proprietary title, was created by the survey: that the plaintiffs in error hold under the proprietary title ; the plaintiffs in ejectment, under the cfianorial title. Their claims are, consequently, adversary to each other.
But this argument cannot be reconciled with the fact. No new title was created by the survey. There was no source from which titlecould be derived, othei than from the proprietary himself. The survey was, not to give a new title, but to separate a certain tract of land from the general mass, which was offered to every adventurer. The effect of this survey was, not to avoid contracts already made, but to give notice to the public, that these lands were thereafter to be acquired by special contract only. The act of 1779 found this to be the existing state of things; and, in dividing the estates of the proprietaries between the Commonwealth and the former owners, adopted the lines of the manors as the lines of partition between them. This created no new title, but left *293 to the proprietaries their former title, within the described boundaries.
We perceive, then, nothing, either in ,tbe law or the fact of this transaction, which tends to show that the possession of the plaintiffs in error has been adversary to the rights of the person under whom he originally claimed.
Having considered the act of 1705 as if it were an act of limitations, ail the reasoning which has been applied to that act, applies also to the act of 1785, on which the 8th exception is founded. The several treaties formed with Britain, have a very important influence on the time which has elapsed since the war between the two countries.
The opinion that the plaintiffs.in ejectment have still a right, notwithstanding the acts of 1705 and 1785, to proceed at law, presupposes their consent to the continuance of the original title, created by the warrant; for if the possession taken under the warrant or survey was not continued with the consent of the proprietary, it immediately became adversary, and the act of limitations immediately commenced. If, then, there be any case in which this assent is not to be presumed, that is a case in which tbeplaintiffin ejectment is barred by the act of 1705 or 1785.
If, as the Court thinks, the rights of the proprie-táries were converted, by long acquiescencé in the usage which must have been known to them, of selling the lands, as being liable only for the purchase money ; or, by the 7th section of the act of 1779, or by both, united, into a mere right to the purchase money, still the remedy of proceeding *294 against the land for the purchase money remains, and is not taken away by the act of 1779. That act, having reserved the purchase money for the proprietor, must, of course, be construed to reserve his remedy, unless it was expressly taken away. It is not easy to point out any other remedy than this, by ejectment. The . original purchaser has transferred; and were his representatives even still liable for the purchase money, which is far from being admitted, they may not be able to pay it, if they could be found. It was not on their personal responsibility, but on the land itself, that the . vendor relied. His claim was attached to the land, and passed with it. The remedy reserved is on the land, not on the person. It would be difficult to form an action at law against the person ; and in Pennsylvania, there is no Court of Chancery, even if a bill in equity could be sustained. The remedy must be by ejectment.
There are other exceptions in the record, which, though not pressed, have not been waived. It was, therefore, the duty of the Court to examine them. The result of that examination is, that the only serious questions in the cause are those which grow out of the acts of 1705 and 1779. These having been rightly decided, there is no error, and the judgment of the Circuit Court is affirmed.

 See Alexander v. Pendleton, 8 Cranch, 462. Base v. Gray, 4 Wheat. Rep. 213. M‘Clary v. Ross, 5 Wheat. Rep. 116. Ricard v. Williams, 7 Wheat. Rep. 59.

 3 Dallas, 457, 465.