SANG LUNG et al. v. JACKSON, Collector.

(Circuit Court, N. D. California. February 21, 1898.)

No. 12,548.

1. EQUITY JURISDICTION—MULTIPLICITY OF SUITS—COMMUNITY OF INTERESTS.
   A number of persons having distinct interests in a quantity of tea about to be destroyed by a collector of customs, under the act forbidding importation of impure teas, may, on the ground of preventing a multiplicity of suits, maintain a suit in equity to enjoin the collector, since they have a common interest in the question whether he has legal authority to commit the act.

2. CONSTITUTIONAL LAW—FOREIGN COMMERCE—REGULATION OF IMPORTS.
   Under its constitutional power to regulate foreign commerce, congress had authority to pass the act of March 2, 1897, to prevent the importation of impure and unwholesome teas, and the power therein given to the secretary of the treasury to appoint a board of experts to prepare standard samples of tea, by which the purity and quality of imports are to be judged, was not a delegation of legislative power.

3. SAME—CONCLUSIVENESS OF APPRAISERS' DECISION.
   The action of the board of appraisers in rejecting as impure and unwholesome certain Canton tea, being a decision of fact by a tribunal to which the matter is referred by law, cannot be reviewed by the courts on the theory that their action was illegal because no standard as to Canton teas was established by the board of experts appointed by the secretary of the treasury.

Thos. D. Riordan and Edward Lande, for complainants.
Samuel Knight, Asst. U. S. Atty., for defendant.

DE HAVEN, District Judge. This is an action in equity brought by a great number of resident aliens, subjects of the Empire of China, against John P. Jackson, as collector of customs at the port of San Francisco, in which the court is asked to enjoin the defendant from proceeding to destroy a large quantity of tea imported by the complainants. The bill of complaint alleges that during the months of May, June, and July, in the year 1897, the complainants imported into the United States from China, and entered at the custom house at the port of San Francisco, 2,910 packages of tea, commercially known as "Canton Tea"; that Canton tea has been largely imported into this country from China since 1868, and is known by that name in the tea trade of the world, and is in general use throughout the United States; that, upon the entry at the custom house of San Francisco of the said teas so imported by complainants, the same were duly examined by the examiner appointed by law, with reference to purity, quality, and fitness for consumption, and that "the said tea was found by the examiner to be not equal in purity, quality, and fitness for consumption to the standards provided by law, and inferior in purity, quality, and fitness for consumption to said standards, for the sole consideration that the only standards provided by law are those embraced in the regulations of the treasury department" adopted May 1, 1897, for the examination of imported teas, under the act of March 2, 1897, and in which regulations Canton tea is not named as one of the standards. The bill further alleges "that the said matter was thereafter referred for decision to a board of three United States general appraisers, who were designated by the secretary of the treasury department of the United States, and that said board did, after due examination, affirm the said finding and decision of said examiner," and upon the same ground; that the defendant, as collector of the port, refuses to issue to complainants any permit for the release or delivery of said tea, or any part thereof, on the sole ground that there is no standard established by law for the said tea, and that the only standards fixed by law "are those limited in and by the regulations of the treasury department in regard to the importation and inspection of tea," adopted May 1, 1897, and which do not include Canton tea. It is further alleged that the defendant, as such collector of the port, and under color of his said office, threatens to destroy the said tea, imported as aforesaid by the complainants, and will so destroy it, unless restrained by injunction; that such threatened injury would be irreparable, and not susceptible of pecuniary compensation, and would also destroy and prohibit the importing business in which complainants are engaged; and that the relief for which complainants ask "is necessary to prevent a multiplicity of judicial proceedings." The bill also contains this allegation: "That it is not intended by the said act of congress approved March 2, 1897, and is in violation thereof, to restrict and limit the standards of purity, quality, and fitness for consumption of all kinds of tea into the United States to those standards only which are defined by said

regulation, and that, so restricted, the same is a preferential standard, which is not founded upon grounds consistent with law or the policy of the law, and constitute a special and unwarranted discrimination, by giving undue preference of one class of tea over another, where both are equal in purity, quality, and fitness for consumption, and are unjust, oppressive, unreasonable, discriminating, unequal, prejudicial, and not authorized by, but contrary to, the letter, spirit, and purpose of the said law of congress approved March 2, 1897." The defendant demurs to the bill upon the ground that complainants have not thereby shown themselves to be entitled to the relief prayed for therein.

1. One of the grounds urged in support of the demurrer is that the bill fails to show that the complainants will sustain irreparable injury, in this: that it is apparent that, for any damage which they or either of them might sustain by reason of the destruction of the tea referred to in the bill, an action at law would afford an adequate remedy, notwithstanding the general allegation that such injury would be irreparable, and not capable of being compensated in damages. It is undoubtedly true that such general allegation in a bill of complaint is not of itself sufficient to show that a plaintiff will suffer irreparable injury, if some threatened action of a defendant is not enjoined. "The facts stated must satisfy the court that such apprehension is well founded." Branch Turnpike Co. v. Board of Sup'rs of Yuba Co., 13 Cal. 190. In my opinion, the facts do not show that complainants would sustain irreparable injury if the defendant should destroy the tea referred to in the bill, as damages would be an adequate compensation for any loss which either of the complainants might sustain by reason of its destruction. But if it is shown by the allegations of the bill that such action of the defendant would be in violation of law, then the resort by the complainants to a court of equity, for the purpose of preventing the commission of such threatened violation of their property rights, may be justified under the well-settled rule that a court of equity may take cognizance of any controversy when necessary to prevent a multiplicity of suits. It is true each of the complainants has a separate and distinct interest in the tea which the defendant threatens to destroy, but they all have a community of interest in the subject-matter of the controversy; that is, a common interest in the question whether the defendant is authorized by law to destroy such tea. The alleged rights of each and all of the complainants depend upon the same facts, and must therefore, necessarily, be determined by the same principle of law. In such a case a court of equity will take jurisdiction in order to prevent a multiplicity of actions. 1 Pom. Eq. Jur. § 269; Osborne v. Railroad Co., 43 Fed. 824; De Forest v. Thompson, 40 Fed. 375. It therefore becomes necessary to consider the further question, whether the complainants have shown by the bill that any legal rights of theirs will be violated by the threatened action of the defendant.

2. On March 2, 1897, congress passed an act entitled "An act to prevent the importation of impure and unwholesome tea." Section 1 of this act declares it to be unlawful for any person after May 1, 1897, to import or bring into the United States any tea inferior in purity,

quality, and fitness, for consumption, to the standards established under the provisions of that act; and by section 2 the secretary of the treasury was directed, immediately after the passage of the act, to appoint a board of seven members, each of whom should be an expert in teas, to prepare and submit to him "standard samples of tea." Section 3 provides "that the secretary of the treasury, upon the recommendation of the said board. shall fix and establish uniform standards of purity, quality, and fitness for consumption of all kinds of teas imported into the United States, and shall procure and deposit in the custom houses of the ports of New York, Chicago, San Francisco, * * * duplicate samples of such standards. * * * All teas, or merchandise described as tea, of inferior purity, quality, and fitness for consumption to such standards shall be deemed within the prohibition of the first section hereof." The act further provides for the examination by an examiner of all teas brought into the United States, and that in case either the importer or collector shall protest against the finding of the examiner, as to the purity, quality, and fitness for consumption of any tea imported, when compared with the proper standards, the matter in dispute shall be referred for decision to a board of three United States general appraisers, to be designated by the secretary of the treasury, and, "if upon such final re-examination by such board the tea shall be found to be inferior in purity, quality, and fitness for consumption to the said standards, the importer or consignee shall give a bond, * * * to export said tea, * * * out of the limits of the United States within a period of six months after such final re-examination; and if the same shall not have been exported within the time specified, the collector, at the expiration of that time, shall cause the same to be destroyed." The act further provides that the board of United States general appraisers "shall be authorized to obtain the advice, when necessary, of persons skilled in the examination of teas." No provision is made in the act for the revision of the findings or decision of the board of general appraisers.

It appears from the allegations of the bill of complaint that the various steps provided by the act above referred to, for the purpose of determining whether the tea imported by the complainants is of such purity, quality, and fitness for consumption as to entitle it to be admitted into the United States, have been taken, and the decision of the officers appointed by law for the purpose of passing upon that question was that such tea should not be admitted. Will the decision of the board of general appraisers. if carried into effect, destroy or impair any vested right belonging to the complainants? The answer to this general question will necessarily determine the judgment to be given in this case.

That the act of March 2, 1897, before referred to, is a valid exercise of the constitutional power of congress to regulate commerce, would seem to admit of no doubt. The power to regulate commerce was defined by Chief Justice Marshall in Gibbons v. Ogden, 9 Wheat. 196, as the power "to prescribe the rule by which commerce is to be governed." The late Justice Miller, in speaking of this definition, said: It is one "which perhaps can never be excelled in its brevity, accuracy,

and comprehensiveness." Miller, Const. 449. The power itself is without any other limitation than that prescribed by the constitution. In the case of County of Mobile v. Kimball, 102 U. S. 691, the court, speaking of the power of congress to regulate commerce, said: "That power is, indeed, without limitation. It authorizes congress to prescribe the conditions upon which commerce in all its forms shall be conducted between our citizens and the citizens or subjects of other countries, and between the citizens of the several states, and to adopt measures to promote its growth and insure its safety." And in Gibbons v. Ogden, 9 Wheat. 196, it is said with greater accuracy: "This power, like all others vested in congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the constitution." These limitations are found in section 9 of article 1 of the constitution, and need not be more particularly referred to, as they do not relate to the present question. The power, then, to prescribe the conditions upon which foreign merchandise may be imported into the United States, is one that resides with congress, and the right of importation is therefore not an absolute or vested right, under the constitution, but must be exercised in subordination to the rules which may be prescribed by congress. The object of the legislation under consideration was to prevent the introduction into the United States of impure and adulterated teas, and, for the purpose of accomplishing this object, congress provided, first, that the secretary of the treasury should, upon the recommendation of a board of skilled experts, establish uniform standards of purity, quality, and fitness for consumption of all teas imported into the United States; and, further, that all teas imported should be first subjected to an examination by an examiner, with the right of appeal from his finding in relation to their purity, quality, and fitness for consumption to a board of general appraisers appointed by the secretary of the treasury. The act further provides that, in making its determination, such board shall have the right to seek the advice of persons skilled in the examination of teas. In providing that the secretary of the treasury should establish uniform standards, congress did not delegate to that officer any of its legislative power. This was simply one of the means devised by congress for carrying out its expressed will that no impure or adulterated teas should be admitted into the United States; and the power to establish such uniform standards, being one calling for the exercise of judgment and discretion in the consideration of facts relating to the qualities of different kinds of teas and the manner of their adulteration, was one which might properly be conferred on that officer. So, also, the power to determine the ultimate questions of fact in relation to the quality, purity, and fitness for consumption of teas sought to be imported, when compared with the established standards, was one which, from necessity, must be lodged somewhere, and it would seem that, in the law in question, ample provision has been made to secure a proper determination of these questions, and thus to carry out the manifest purpose and object of the statute without injustice to the importer. In my opinion, the decision of the board of general appraisers, provided for by the act, is

not the subject for review by the courts upon any allegation of mistake either of law or fact. The duty of finally determining the facts upon which the right of the importer to have this class of merchandise admitted into the United States depends, is imposed upon that board, and this case must, therefore, be governed by the general rule of law that, where the determination of facts is lodged in a particular officer or tribunal, the decision of that officer or tribunal is conclusive, and cannot be reviewed, except as authorized by law. This is a familiar rule, and is sustained by a uniform line of authorities. See upon this point In re Day, 27 Fed. 678; Johnson v. Towsley, 13 Wall. 83; Lem Moon Sing v. U. S., 158 U. S. 538, 15 Sup. Ct. 967.

The rule just stated has, however, this qualification: Where the decision of a special tribunal interferes with a vested right, and such decision has been induced by fraud or by mistake of law, a court of equity has the power to correct such mistake. This jurisdiction has been constantly asserted by the courts of equity in cases arising under the land laws of the United States, where officers of the land department have in their decisions, by mistake in construction of the law, or by reason of imposition or fraud practiced upon them, taken from one party rights which the law intended to secure to him, and which equity would regard as vested, and transferred them to another. The complainants seek to bring this case within this rule of equity jurisdiction, by alleging that the regulations adopted by the secretary of the treasury, for the purpose of determining the quality of imported tea, are contrary to the act of congress, because such regulations omit to establish a standard of quality for Canton tea. I do not deem it necessary to determine whether such regulations, properly construed, prohibit the admission of Canton tea, if it is not inferior in quality to either of the special standards named in such regulations. It is alleged in the bill that such is the effect of the regulations, and that the board of general appraisers based its decision entirely upon such construction of the regulations of the treasury department; but I do not think the complainants have any such absolute or vested right to import tea into the United States as would authorize a court of equity to inquire whether the secretary of the treasury in establishing standards, under the act of March 2, 1897, or the board of general appraisers in its decision, made any mistake, either of law or fact. The principle upon which courts of equity act in asserting a jurisdiction to set aside or correct either judicial or executive action is that such jurisdiction is necessary in order to preserve some vested right in the complainant which otherwise would be impaired or lost. That principle does not apply here. Congress might have absolutely prohibited the importation of Canton tea without violating any vested rights of the complainants. Having the right to prohibit, it has plenary power to prescribe the condition upon which such importation may be made; and as the right to import tea into the United States is made by the act of congress to depend entirely upon the final judgment of the board of general appraisers that it is equal in quality, purity, and fitness for consumption to the standards established by the secretary of the treasury, it would seem to follow that a person desiring to import such merchandise is not

entitled to resort to a court of equity for the purpose of setting aside or correcting such final determination, upon the alleged ground of mistake made by such special tribunal. The act of congress contemplates that the decision of the board of general appraisers shall be final, and not subject to revision by the courts. The demurrer will be sustained, and the bill dismissed.