KANSAS CITY SOUTHERN RY. CO. v. QUIGLEY et al.

(Circuit Court, W. D. Arkansas, Ft. Smith Division. June 13, 1910.)

No. 200.

1. Courts (§ 299*)—Federal Courts—Federal Question.

A bill by a railroad company to enjoin suits at law for damages or in equity to restrain its removal of a division point on the ground, among others, that the enforcement of an alleged contract to maintain the railroad's shops, roundhouses, etc., at the point in question would interfere with interstate commerce, and prevent complainant's compliance with Act Cong. March 4, 1907, c. 2939, 34 Stat. 1415 (U. S. Comp. St. Supp. 1909, p. 1170), known as the "Hours of Service Law," did not show federal jurisdiction as involving a federal question, under the rule that to give the federal Circuit Court jurisdiction for that reason the federal question must appear necessarily in the statement of the cause of action, and not as mere allegations of a defense pleaded.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 841; Dec. Dig. § 299.*

Jurisdiction in cases involving federal question, see notes to Bailey v. Mosher, 11 C. C. A. 308; Montana Ore-Purch. Co. v. Boston & M. C. C. & S. Min. Co., 35 C. C. A. 7.]

2. Equity (§ 153*)—Bill—Nature of Case.

Whether a bill states a cause of action for relief in equity is not to be determined merely from general allegations of equity cognizance or from conclusions of law and fact but from the alleged facts themselves, which, if true, make out a case of equity jurisdiction.

[Ed. Note.—For other cases, see Equity, Dec. Dig. § 153.*]

3. Injunction (§ 26*)—Equitable Relief—Nature of Bill—Quia Timet—Cloud on Title—Bill of Peace.

Where complainant railroad company was in quiet possession of all its property at M., and no one threatened to disturb such possession and enjoyment by suit or otherwise, nor to do anything to cloud complainant's title to such property or to interfere with the use thereof, but many property owners in M. opposed complainant's removal of its division point to a different location, as in violation of a contract previously made with complainant's predecessor, a bill by complainant seeking to restrain such property owners from instituting suits at law for damages or in equity for specific performance of such contract was not maintainable as a bill quia timet to remove a cloud on title or as a bill of peace.

[Ed. Note.—For other cases, see Injunction, Dec. Dig. § 26.*]

4. Equity (§ 42*)—Jurisdiction—Determination of Question.

Whether a bill states a case of equitable cognizance is jurisdictional, and the question may therefore be raised by the court of its own motion.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 119, 120; Dec. Dig. § 42.*]

5. Courts (§ 371*)—Federal Courts—Jurisdiction—State Statutes.

Since state legislation cannot enlarge the jurisdiction of the federal courts in equity, such legislation, if conflicting with the distinction observed in federal courts between law and equity, is unenforceable.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 907, 972–976; Dec. Dig. § 371.*

Jurisdiction as affected by state laws, see note to Barling v. Bank of British North America, 1 C. C. A. 513.]

6. Injunction (§ 26*)—Equity Jurisdiction—Multiplicity of Suits.

Complainant's predecessor contracted to maintain its division point and railroad shops at M., and, after this had been done for 16 years, com-

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

plainant found that it was inconvenient to longer maintain them there and impossible to so maintain them and operate the road so as to comply with the hours of labor act of Congress (Act March 4, 1907, c. 2939, 34 Stat. 1415 [U. S. Comp. St. Supp. 1909, p. 1170]), and, having been threatened with suits to enforce such contract and to recover damages for its breach, filed a bill of equity to restrain such actions. *Held*, that the bill was *not maintainable to avoid a multiplicity of suits either in equity or at law*.

[Ed. Note.—For other cases, see Injunction, Dec. Dig. § 26.*]

7. SPECIFIC PERFORMANCE (§ 25*)—NATURE OF CONTRACT—LOCATION OF RAILROAD DIVISION POINT.
   A suit for specific performance of a contract to locate and maintain a railroad division point at M. would be unsustainable in case it was shown that the continuance of such division point at M. would either impose a burden on interstate commerce creating a congestion of traffic and embarrass the service of the road and inflict irreparable loss on it or prevent its compliance with the federal hours of labor act (Act March 4, 1907, c. 2939, 34 Stat. 1415 [U. S. Comp. St. Supp. 1909, p. 1170]).

   [Ed. Note.—For other cases, see Specific Performance, Dec. Dig. § 25.*]

8. INJUNCTION (§ 26*)—RESTRAINING SUITS AT LAW—IRREPARABLE INJURY.
   That the denial of an injunction restraining suits for breach of a railroad's alleged contract to maintain a division point at a certain place would result in many such suits for damages being instituted against a railroad company did not justify the issuance of such injunction on the theory that the railroad company would be thereby irreparably injured.

   [Ed. Note.—For other cases, see Injunction, Dec. Dig. § 26.*]

9. INJUNCTION (§ 137*)—CROSS-BILL—PRELIMINARY INJUNCTION.
   Where a bill by a railroad company to restrain property owners at M. from suing at law or in equity to restrain it from removing its division point to another place was without equity and unsustainable, and it appeared that defendants' right to prevent the removal was doubtful, a restraining order would not be granted on a cross-bill to prevent such removal on the denial of the injunction prayed for in the original bill.

   [Ed. Note.—For other cases, see Injunction, Dec. Dig. § 137.*]

In Equity. Suit by the Kansas City Southern Railway Company against R. M. Quigley and others, in which defendants file cross-bill for affirmative relief. Bill dismissed.

The complainant, a corporation organized and existing under the laws of the state of Missouri, and a citizen of that state, exhibited its bill of complaint against R. M. Quigley and 17 other defendants, each and all of them alleged to be citizens and residents of Polk county, in the state of Arkansas, and of the Ft. Smith Division of the Western District thereof. The prayer of the bill is: "That the rights of your orator and of the defendants herein and of the other owners of property in and adjoining the city of Mena, represented by the defendants herein, be declared and established, and that the claims of the defendants and of each and all of the persons represented by 'them be declared to be unfounded in law and in equity, and that your orator be decreed to have the right free from any claims of any kind of any of said defendants or other persons to remove its central division point from the city of Mena, and that the defendants and each of them, and each and all of the other owners of property in and adjoining the said city of Mena, be temporarily restrained 'and enjoined pending the determination of this cause, and at the final hearing hereof be permanently restrained and enjoined from instituting any suits at law or in equity founded upon the assertion of said claims or growing out of the facts and circumstances hereinbefore alleged or to prevent your orator for any reason from so removing its central division point from the said city of Mena or from instituting any suits for damages growing out of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

such removal, and for such further and additional relief as your orator may be entitled to."

In substance the bill alleges:

(1) That it is authorized to do business in the state of Arkansas. That its railroad is engaged in state and interstate commerce, and that it operates such railroad in the states of Missouri, Kansas, Arkansas, Oklahoma, and Louisiana. That for many years it has owned and operated a line of railroad extending from Kansas City, in the state of. Missouri, by continuous line of railroad to and through the city of Mena, in Polk county, state of Arkansas..

(2) It alleges: That this cause of action arises under the Constitution and laws of the United States. That it is a civil action, and involves a controversy between citizens of different states, and that the subject-matter in dispute, exclusive of interests and costs, exceeds $2,000.

(3) That the defendants are owners of real and personal property in and adjoining the city of Mena, Ark., and represent, as a class, the owners of real and personal property in and adjoining the city of Mena, and that the members of said class are so numerous. that they cannot without manifest inconvenience and oppressive delay be made parties to the bill.

(4) That complainant's line of railroad within and through the states named has been divided into two principal divisions, each of which divisions has been, in turn, subdivided into operating or subdivisions. That now, and ever since the original construction of complainant's road, the central division has been located at Mena, where freight and passenger trains change engines and crews, and where a large number of complainant's employés have resided, and where complainant's roundhouses, shops, and terminal yards required at that division point are located. 'That "an act to promote the safety of employés and travelers upon railroads by limiting the hours of service of employees thereon" enacted by Congress became effective on the 4th day of March, 1907 (Act March 4, 1907, c. 2939, 34 Stat. 1415 [U. S. Comp. St. Supp. 1909, p. 1170]). That up to that time the maintenance of the division point at Mena was feasible and practicable. That since that time experience has demonstrated that the division point at Mena cannot be maintained without great congestion of traffic, impairment of service, and irreparable loss to complainant from unavoidable, constant, and continual violence of the act of Congress referred to, and subjecting the complainant to penalties on account thereof. That, to avoid the results stated, it is necessary to rearrange the location of both its central division point and the operation of its district and subdivision terminals, and to remove from the city of Mena to such points as may be fixed as division points the roundhouses, shops, and terminal yards now maintained at Mena.

(5) That complainant's railroad proper from a point approximately 20 miles south of Kansas City in the state of Missouri, through the states of Missouri, Kansas, Arkansas, and Oklahoma to and through the city of Mena, were formerly owned and operated by the Kansas City, Pittsburg & Gulf Railroad Company, and that so much of said line as extends to and through the city of Mena was constructed by the Arkansas Construction Company under a written contract with the Kansas City, Pittsburg & Gulf Railroad Company with the defendant and citizens and property owners in and adjoining the city of Mena claiming and asserting that at the time of said construction the Kansas City, Pittsburg & Gulf Railroad Company by certain printed matter represented that the central division point of the Kansas City, Pittsburg & Gulf Railroad Company and the division shops and yards would be maintained in the city of Mena, and that the town site of Mena was sold with the knowledge of the Kansas City, Pittsburg & Gulf Railroad Company to the defendants and the present owners of property in and adjoining the city of Mena, and their predecessors in title, upon the faith of such representation. That the defendants claim and assert that a binding and enforceable contract or obligation was thereby created in their favor and binding upon the complainant for the perpetual maintenance of said central division point and division shops and terminal yards at the city of Mena. The complainant specifically denies that such printed matter so used by it was binding upon the Kansas City, Pittsburg & Gulf Railroad Company, and denies that any such statements or representations were made by it. The bill then alleges that on April 1, 1899,

all the property and assets of the Kansas City, Pittsburg & Gulf Railroad Company were incumbered by a first mortgage or deed of trust to the State Trust Company as trustee, securing its funded debt, and subsequently, upon a bill of complaint filed by the said State Trust Company, such proceedings were had that the property and affairs of the Kansas City, Pittsburg & Gulf Railroad Company passed into the hands of a receiver appointed by the Circuit Court of the United States for the Western Division of the Western District of Missouri, and that said action was brought to foreclose the mortgage securing the funded debt, and ancillary proceedings were later instituted by said trustee in this court; that thereafter a decree of foreclosure was passed and the property sold, and that the complainant became the purchaser thereof; that, by reason of such proceeding, the complainant became the owner of all the property and assets of the Kansas City, Pittsburg & Gulf Railroad Company, including its line of railroad into and through the city of Mena, discharged from any and all obligations, except such as it was required to assume under the said decree of foreclosure as being superior in equity to the lien of the said mortgage. The bill then alleges that, if the Kansas City, Pittsburg & Gulf Railroad Company had made the representations alleged, such representations were not binding upon the complainant, the same not having been imposed upon the complainant by the terms of said decree. The bill then alleges that notwithstanding the facts last stated that the defendant and others claim and assert that the complainant assumed the pretended obligations of the Kansas City, Pittsburg & Gulf Railroad Company hereinbefore referred to, which the complainant specifically denies. The bill then alleges that, if the Kansas City, Pittsburg & Gulf Railroad Company had obligated itself to perpetually maintain at the city of Mena its central division point, the claim of said defendant and others would be unfounded in law and equity for the reason that said pretended obligation is void because contrary to public policy and ultra vires, and, if it had assumed such obligation, the obligation itself has been fully satisfied by the maintenance of the central division point of the Gulf company at Mena for 16 years past.

(6) The bill alleges that the defendants claim that on the 16th of March, 1907, at the city of Mena that one L. F. Loree, chairman of complainant's executive committee and its principal executive officer at the city of Mena, in the presence of certain property owners and citizens of Mena, and of the said executive committee, composed of J. R. Davis and others, stated to a committee of said citizens that the central division point of the complainant's road would remain at Mena, and upon the strength of this statement the citizens of Mena and many of its citizens, including defendant, made large and valuable improvements, the value of which will be greatly diminished if said central division point is removed from Mena. The bill alleges that this claim is unfounded and untrue; that no such statement was made; that complainant claims that by reason of said alleged statement of the said Loree and the improvements made on the strength thereof the complainant is estopped from removing its central division point from Mena. The bill then alleges that by reason of the premises a restriction or servitude has been placed upon the use of its railroad, whereby it is required to maintain its central division point at Mena forever, and a similar servitude upon the use of complainant's property within the city of Mena; that the claims and assertions of defendants are unfounded in law and equity; that, if such statements had been made by the said Loree, they were not binding because without consideration and were not in writing, as required by the statute of frauds, and were not made by authority of the board of directors, or the executive committee, or any other person vested with authority to contract for the perpetual location of complainant's central division point, and were therefore ultra vires, void, and contrary to public policy.

(7) The bill then alleges that defendant and other owners of real and personal property in and adjoining the said city of Mena have threatened and are threatening to institute an injunction suit or injunction suits to restrain the complainant from the removal of its central division point from the city of Mena, and, as complainant is informed and believes and so charges, is preparing to institute said suit, and also to institute separate actions at law against complainant to recover damages for the removal of said central

181 F.—13

division point from Mena whenever the same shall be done. The bill then alleges that said claims and threats are a cloud upon, or in the nature of a cloud upon, the title of complainant's properties, and an interference with their proper use and management; that said injunction suits and actions at law for damages will result in a multiplicity of suits which complainant will be required to defend; that the claims of said defendant and the owners of other property in like situation in and about Mena originate in a common source, and that there is a community of interest among all the defendants and all the other owners of real and personal property in and around the city of Mena represented by them; that there are questions of law and fact, the determination of which, unless settled by a suit in equity, will involve a multiplicity of suits; that the assertion of said claims and threats, are an interference with the prosecution of complainant's plan for the readjustment of its operating divisions in the manner and for the purpose alleged, and will result in irreparable loss, so that it would create an uncertainty as to complainant's road in the management of this property in the interest of itself and the public at large, the continuance of which is a burden or servitude upon its proper use and management, a burden upon interstate commerce, and will prevent the proper adjustment of its division terminals, the effect of which is detrimental to the safety of persons and property and to the employés of complainant, and tends to subject it to the penalty of the act of Congress commonly known as the "Hour of Service Law," and likewise to impair the value of the bonds and stocks which have been issued and sold in large amounts upon the faith of complainant's right to operate its property and maintain efficiency and with due regard to such laws as may be from time to time enacted by Congress in its regulation of interstate commerce carriers. Then follows the prayer for relief hereinbefore set out.

S. W. Moore and Read & McDonough, for complainant.
John A. Eaton, F. A. Youmans, Elmer J. Lundy, and J. I. Alley, for defendants.

ROGERS, District Judge (after stating the facts as above). In the view taken by the court, it is unnecessary to set out at length the other pleadings. The question of jurisdiction raised by the answer, growing out of the denial of diverse citizenship, need not be noticed now. To my mind it is clear that no jurisdiction in this case can be upheld on the ground of the alleged existence of a federal question. The principle governing that class of cases is stated in Devine v. Los Angeles, 202 U. S. 334, 26 Sup. Ct. 657, 50 L. Ed. 1046, as follows:

"It would be wholly unnecessary and improper in order to prove complainant's cause of action to go into any matters of defense which the defendants might possibly set up, and then attempt to reply to such defense, and thus, if possible, to show that a federal question might or probably would arise in the course of the trial of the case. To allege such defense and then make an answer to it before the defendant has the opportunity to itself plead or prove its own defense is inconsistent with any known rule of pleading so far as we are aware, and is improper. The rule is a reasonable and just one that the complainant in the first instance shall be confined to a statement of its cause of action, leaving the defendant to set up in his answer what his defense is. * * * The cases hold that to give the Circuit Court jurisdiction the federal question must appear necessarily in the statement of the plaintiff's cause of action, and not as mere allegations of the defense which the defendants intend to set up or which they rely upon. Third Street Railway Company v. Lewis, 173 U. S. 457 [19 Sup. Ct. 451, 43 L. Ed. 766]."

Tested by this rule, the bill in this case falls far short of stating any facts upon which jurisdiction could attach because of the existence of a federal question.

But, assuming both diverse citizenship and the existence of a federal question, the jurisdiction in a court of equity does not necessarily follow. Federal questions are raised and decided in courts of law as well as courts of equity, and the question still remains, Has the complainant stated a case of equity cognizance? This question must be determined, not merely from general allegations of equity cognizance, or conclusions of law and fact, but from the alleged facts themselves which, if true, make out a case of equity cognizance. Copious references are given in the briefs of counsel bearing upon bills quia timet, or to remove a cloud upon the title to real estate, and upon bills of peace, as they are called. In Holland v. Challen, 110 U. S. 20, 3 Sup. Ct. 497, 28 L. Ed. 52, Mr. Justice Field said:

"A bill quia timet, or to remove a cloud upon the title of real estate, differed from a bill of peace, in that it did not seek so much to put an end to vexatious litigation respecting the property as to prevent future litigation by removing existing causes of controversy as to its title. It was brought in view of anticipated wrongs or mischiefs, and the jurisdiction of the court was invoked because the party feared future injury to his rights and interests. Story's Equity, § 826. To maintain a suit of this character it was generally necessary that the plaintiff should be in possession of the property, and, except where the defendants were numerous, that his title should have been established at law or be founded on undisputed evidence or long continued possession. Alexander v. Pendleton, 8 Cranch, 462 [3 L. Ed. 624]; Peirsoll v. Elliott, 6 Pet. 95 [8 L. Ed. 332]; Orton v. Smith, 18 How. 263 [15 L. Ed. 393]."

The bill in this case is neither a bill quia timet, or a bill to remove a cloud from the title upon real estate, or a bill of peace. The complainant owned and is in the quiet and undisturbed possession of all its properties at Mena. No one is threatening to disturb that possession and enjoyment by suit or otherwise. No one is doing anything or threatening to do anything to cloud complainant's title to its properties, or interfering with its uses. On the contrary, we learn from the bill that defendants claim and desire that complainant shall remain in the possession and continue the enjoyment and use of its said properties at Mena, in the future as in the past, unclouded and undisturbed by them. There is, therefore, no cloud to be removed, and there was no threatened litigation at the time this bill was filed, vexatious or otherwise, about it, and there were no causes of controversy as to its title to be removed in order to prevent future litigation. Nor can any general allegations as to what will follow if the restraining order is not granted, such is irreparable injury, or multiplicity of suits, be permitted to take the place of the substantive facts essential to give a court of equity jurisdiction.

Stripped to the skin, this is a bill which, if it stand at all, must stand on the principle that equity will take jurisdiction in order to avoid a threatened multiplicity of suits, said suits not about to be instituted by the same defendants, but by separate defendants, each of whom, in a certain event, may have a distinct cause of action in his own right. The question resolves itself to this: Does the avoidance of a multiplicity of suits under such circumstances, in the absence of any other distinctive ground or acknowledged head of equity cognizance, give jurisdiction in equity to the courts of the United States?

More briefly stated, the question is this: Is the subject-matter of this suit within the cognizance of a court of equity? This question I think is raised by the answer; but, if not, it is jurisdictional, and as held in Parker v. Winnipiseogee Lake Cotton & Woolen Co., 2 Black (U. S.) 550, 17 L. Ed. 333, may be raised by the court sua sponte.

Many of the states, Arkansas among the number, have enacted statutes conferring jurisdiction on their own courts of equity upon certain conditions not recognized in the courts of equity of the United States. The question of jurisdiction in this case finds no warrant in any such statute in force in Arkansas. Undoubtedly there are certain rights created by state statutes which United States courts of equity can and do enforce, but state legislation cannot enlarge the jurisdiction of the United States courts in equity, if such legislation conflicts with the distinction strictly observed in the federal courts between law and equity. Adoue et al. v. Strahan et al., 97 Fed. 691, and cases there cited, afford examples of that character. In that case this court said:

"Counsel for the plaintiffs insist that the case of Rich v. Braxton, 158 U. S. 405, 15 Sup. Ct. 1006, 39 L. Ed. 1022, is authority in support of the bill. The court thinks not. In that case the precise question was not presented at all. Counsel also cite Holland v. Challen, 110 U. S. 15, 26, 3 Sup. Ct. 495, 28 L. Ed. 52, to the effect that United States courts of equity will respect state statutes enlarging equitable remedies. Unquestionably that is true, but it is subject to the limitation that rights created by state statutes will not be administered if they conflict with the distinction strictly observed in said courts between law and equity, or if they contravene section 723 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 583), which provides that suits in equity shall not be sustained in either of the courts of the United States, where a plain, adequate, and complete remedy may be had at law, or if they violate the constitutional right of parties, in actions at law, of a trial by jury."

Nor are the decisions of state courts, if they were harmonious, necessarily decisive of the question to be considered. It may be conceded that there are state decisions sustaining this bill. They are not all in accord, as we shall see. Pomeroy, in his Equity Jurisprudence, §§ 268, 269, et seq. upholds the jurisdiction in such cases. One federal case cited by the author it is thought sustains the text, and only one—i. e., Osborn v. Railroad Company (C. C.) 43 Fed. 824—the opinion rendered by Mr. Justice Harlan at circuit. I think the facts in that case readily distinguish it from the case at bar. Crews et al. v. Burcham, 1 Black (U. S.) 352, 17 L. Ed. 91, is cited by Justice Harlan to sustain Osborn v. Railroad Company, supra, but that case is obviously distinguishable from Osborn v. Railroad Company, supra, and the one at bar also. But I need not consider that phase of the matter. It is taken care of later. In Tribette et al. v. Illinois Central Railroad Company, 70 Miss. 182, 12 South. 32, 19 L. R. A. 660, 35 Am. St. Rep. 642, the Supreme Court of Mississippi carefully considered and refused to follow Pomeroy or Osborn v. Railroad, supra. The opinion was written by Chief Justice Campbell, justly esteemed one of the ablest judges on the bench in this country. I quote from the opinion as follows:

"A number of owners of property in the town of Terry, destroyed by fire from sparks emitted by an engine of the appellee, severally sued in the Cir-

cuit Court to recover of the appellee damages for the respective losses by said fire, alleged to have resulted from the negligence of the defendant. While these actions were pending, the appellee exhibited its bill against the several plaintiffs, averring that no liability as to it arose by reason of the fire, which arose, not from any negligence or wrong of it or its servants, but from the fault of others, for which it is not responsible, and that the plaintiffs in the different actions are wrongfully seeking to recover damages by their several actions, all of which grew out of the same occurrence, and depend for their solution upon the same questions of fact and of law, wherefore, to avoid multiplicity of suits, and the consequent harassment and vexation, all of the said several plaintiffs are sought to be enjoined from prosecuting their different actions, and to be brought in and have the controversies settled in the one suit in equity. There is no common interest between these different plaintiffs, except in the questions of fact and law involved. The injunction sought was granted, and the defendants served with process, when they appeared and demurred to the bill, and moved to dissolve the injunction on the face of the bill. The case was heard on motion to dissolve the injunction, and it was overruled, and an appeal was granted. The question presented is as to the rightfulness of the suit against the defendants, on the sole ground that their several actions at law involve the very same matters of fact and law, without any other community of interest between them. The granting and maintaining the injunction are fully sustained by 1 Pom. Eq. Jur. § 225 et seq., and it is probable that any judge authorized would have granted the injunction upon the text cited. But we affirm, after a careful examination and full consideration, that Pomeroy is not sustained in his 'conclusions' stated in section 269 of his most valuable treatise, and that the cases he cited do not maintain the proposition that mere community of interest 'in the questions of law and fact involved in the general controversy, or in the kind and form of relief demanded and obtained by or against each individual member of the numerous body,' is ground for the interposition of chancery to settle in one the several controversies. There is no such doctrine in the books, and the zeal of the learned and usually accurate writer mentioned to maintain a theory has betrayed him into error on this subject. It has so blinded him as to cause the confounding of distinct things in his views of the subject, to wit, joinder of parties and avoidance of multiplicity of suits. It has been found that many of the cases he pressed into service to support his assertion are on the subject of joinder where confessedly there could be no doubt that the matter was of equity cognizance. Every case he cited to support his text will be found to be either where each party might have resorted to chancery, or been proceeded against in that forum, and to rest on some other recognized ground of equity interference other than to avoid multiplicity of suits. The cases establish this proposition, viz., where each of several may proceed, or be proceeded against, in equity, their joinder as plaintiffs or defendants in one suit is not objectionable. But this is a very different question from that, whether merely because many actions at law arise out of the same transaction or occurrence, and depend upon the same matters of fact and law, all may proceed or be proceeded against jointly in one suit in chancery; and it is believed that it has never been so held, and never will be, in cases like those here involved. Where each of several parties may proceed in equity separately, they are permitted to unite and make common cause against a common adversary, and one may implead in one suit in equity many who are his adversaries in a matter common to all in many cases, but never when the only ground of relief sought is that the adversaries are numerous, and the suits are for that not in itself a matter for equity cognizance. Attention to the distinction mentioned will resolve all difficulties in considering the many cases on this subject. There must be some recognized ground of equitable interference in the subject-matter of the controversy, or common right or title involved, to warrant the joinder of all in one suit, or there must be some common purpose in pursuit of a common adversary, where each may resort to equity, in order to be joined in one suit; and it is not enough that there 'is a community of interest merely in the question of law or of fact involved,' etc., as stated by Pomeroy in section 268. Although he asserts that this early theory has long been abandoned, he fails

utterly to prove it. An examination of the cases he cited under section 256 et seq. will show this to be true. The opinion of the justice (Harlan) in Osborn v. Railroad Co. (C. C.) 43 Fed. 824, does support the text of Pomeroy, and cites 1 Pom. Eq. Jur. §§ 245, 255, 257, 268, 293, and Crews v. Burcham, 1 Black, 352–357, 17 L. Ed. 91. We are content with what has already been said as to the text of Pomeroy, and affirm that but one of his citations sustains his conclusion, and that the language of Harlan, J., in the case cited. Nor does Crews v. Burcham sustain the language of Justice Harlan. It belongs to the class of cases where each party might have brought his bill, and all who had a common cause were permitted to make common contest in chancery with their adversaries who were united by a common tie. The decision of the case in which Harlan, J., gives support to the doctrine of Pomeroy is not complained of, but the opinion is not justified by any case with which we have been made acquainted. The case was one in which each might have brought his separate bill to quiet title, and all concerned were permitted to unite in one bill against their common adversary; and so, it is believed, will be found all the cases on this subject. Certainly those relied on by Pomeroy are of this character."

Judge Campbell then takes up every case cited by Pomeroy, and shows that they all either fall within the rule cited by him, or that they are readily differentiated from the text of Pomeroy by the peculiar facts of the respective cases. Later, in summing up the discussion, on page 190, 70 Miss., on page 33, 12 South. (19 L. R. A. 660, 35 Am. St. Rep. 642), he says:

"And while judges have in various instances cited, and sometimes quoted, Pomeroy, in the language alone characterized as unsupported, in every instance, we think the case will not call for it, but to be resolvable independently of it upon other grounds of equitable interference; and in our opinion not one of the learned courts which have cited or quoted Pomeroy in the way mentioned would sustain this bill if it was before it for decision. There is danger that by frequent repetitions and piling up assertions judges citing and quoting text-books, and text-writers citing the cases thus referring to them, a false doctrine might acquire strength enough to dispute with the true; but we do not believe that any accumulation of dogmatic assertion and citations and quotations can ever establish the proposition that a defendant sued for damages by a dozen different plaintiffs, who have no community of interest or tie or connection between them except that each suffered by the same act, may bring them all before a court of chancery in one suit, and deny them their right to prosecute their actions separately at law as begun by them. It has never been done. There is no precedent for it, and, while this is not conclusive against it, it is significant and suggestive. If it is true, as stated by Pomeroy, and some quoting him, that mere community of interest in matters of law and fact makes it admissible to bring all into one suit in chancery in order to avoid multiplicity of suits, all sorts of cases must be subject to the principle. Any limitations would be purely arbitrary. It must be of universal application, and strange results might flow from its adoption. The wrecking of a railroad train might give rise to a hundred actions for damages instituted in a dozen different counties under our law as to venue of suits against railroad companies, in some of which executors or administrators or parent and children might sue for the death of a passenger, and in others claims would be for divers injuries. If Pomeroy's test be maintainable, all of these numerous plaintiffs, having a community of interest in the questions of law and fact, claiming because of the same occurrence, depending on the very same evidence, and seeking the same kind of relief (damages), could be brought before a chancery court in one suit to avoid multiplicity of suits. But we forbear. Surely the learned author would shrink from the contemplation of such a spectacle; but his doctrine leads to it, and makes it possible."

A similar question arose in Fellows et al. v. Spaulding, 141 Mass. 92, 6 N. E. 548. The opinion is short, and I quote the whole of it:

"Morton, C. J. This is a bill in equity to restrain the several defendants from proving their claims against an insolvent debtor in the court of insolvency. If, in any case, such a bill in the nature of a bill of peace can be maintained, where there are many creditors whose debts depend upon the same question, and who threaten, by separate appeals, to harass the assignee with a multiplicity of vexatious suits, which we need not decide, this bill does not state a case which calls for the interposition of a court of equity. Such a bill is addressed to the discretion of the court of equity, and will not be entertained unless it appears that there is a practical necessity for the interposition of the court to prevent vexatious litigation. The bill sets out that numerous creditors have presented their several debts for proof in insolvency, which have not been passed upon by the judge of insolvency, and that they are all controlled and owned by one of the defendants. The same questions of law are raised in each case, and there is no reason why one suit in the usual course of proceedings in insolvency, the other cases being continued to abide the result, should not settle all the cases. There is no allegation that the defendants threaten or intend to harass the plaintiffs by vexatious litigation, and practically the whole controversy can be conveniently settled in the forum to which it belongs. We see no reason for restraining the defendants by injunction from pursuing the remedy which the statutes provide for such cases. Bill dismissed."

The learned counsel for plaintiff have not cited a single binding or authoritative federal case which combats the principle laid down by these two eminent state courts which have considered this question purely from the standpoint of equity jurisdiction, unaffected by any state legislation. My own research has disclosed none. Surely it cannot be that, if the law is otherwise, there is no binding or authoritative case to support it. The cases are innumerable which border close along the line on which this bill is framed, and it is manifest that the pleader left no stone unturned to bring the framework of the bill within the scope of those decisions in so far as the facts warranted. Let us see.

In Boise Artesian Water Co. v. Boise City, 213 U. S. 279, 29 Sup. Ct. 427, 53 L. Ed. 796, Moody, J., said:

"The appellant, a West Virginia corporation, brought in the Circuit Court of the United States for the District of Idaho this bill in equity against Boise City, a municipal corporation. There was a demurrer to the bill, which, upon consideration of the merits of the case set forth therein, was sustained by the judge of the Circuit Court and the bill dismissed. The company appealed directly to this court. The facts set forth in the bill and exhibits and the relief and grounds of relief claimed so far as necessary to develop the point decided may be conveniently stated in narrative form. The company was incorporated for and is engaged in supplying the city and its inhabitants with water for municipal and domestic purposes. It had acquired the property, franchises, right, and privileges of certain individuals and corporations, who had been from time to time granted by ordinance of the city the privilege of laying and maintaining pipes in the streets and supplying through them water for municipal and domestic uses. The company conducted its business by virtue of these ordinances, and has invested large sums of money. The ordinances need not be set forth in detail, and it is enough to say that the company contends that they are franchises for a term of not less than 50 years, and constitute a contract inconsistent with the license fee or tax hereafter referred to, while the city contends that they are mere permissions, revocable at any time. The rates are fixed by commissioners, acting under the authority of a law of the state, and are to remain in force three years from the date of their establishment. After the fixing of the rates and before the expiration of the three years, on the 31st day of May, 1906, the city enacted an ordinance requiring that the company 'hereafter pay to said Boise

City, on the first day of each and every month, a monthly license of $300.00, for the privilege granted * * * to lay and repair water pipes in the streets and alleys of said city.' The ordinance then made a demand for the monthly payment of said license, and directed the city clerk to notify the company of the requirements of the ordinance."

I have quoted this statement of the case because of the striking similarity of the case as made by the bill to the one at bar so far as the reasons why the injunction should be granted are concerned. Now, on what ground did the pleader in that case invoke the power of a court of equity? The opinion answers the question. Justice Moody said:

"The main object of the bill is to obtain an injunction against the enforcement of this ordinance upon the grounds (1) that other corporations, associations, and individuals using the streets and alleys of the city for various purposes are not required to pay a license, and therefore there was by the ordinance a denial of the equal protection of the laws; (2) that the city, in pursuance of its claim that the ordinances grant only a revocable permission to occupy the streets, threatens and intends to impose further burdens and assessments, and threatens to remove the pipes and the works from the city; (3) that the city has presented monthly bills and has brought an action at law in the state court to recover the amount alleged to be due on account of the license fee imposed, and that there is therefore danger of a multiplicity of suits; (4) that the ordinance has cast a cloud upon the company's franchises and right to supply water to the city and its inhabitants, and thereby depreciated the value of the company's property, impaired its credit, embarrassed its business, and confiscated its property; (5) that the ordinance impairs the obligation of the contract made by the ordinances granting the rights, privileges, and franchises; (6) that the enforcement of the ordinance would deprive the company of its property without due process of law and abridge its privileges and immunities granted by the fourteenth amendment; (7) and that the ordinance violates the Constitution and laws of the state. A subordinate object of the bill is to recover from the city certain amounts due on account of water supplied to fire hydrants, which the city declines to pay, disputing its liability so to do."

The Circuit Court in that case dismissed the bill on the merits. The Supreme Court of the United States, in declining to consider the merits, said:

"We do not enter upon that subject because there is a deeper question which seems to us decisive of the case. That question is whether the plaintiff is entitled, on the allegations of its bill, to relief in equity in the federal courts. * * *

"It is obvious that the rights of which the company seeks to avail itself are rights cognizable in a court of law, and not rights created only by the principles of equity. The sum of the company's contentions is that the imposition of the license fee was illegal, unconstitutional, and void. All these contentions are open in a court of law. It is a guiding rule in equity that in such a case it will not interpose where there is a plain, adequate, and complete remedy at law. This rule at an early date was crystallized into statute form by the sixteenth section of the judiciary act (Rev. St. § 723), which, if it has no other effect, emphasizes the rule and presses it upon the attention of courts. New York, etc., v. Memphis Water Co., 107 U. S. 205, 214 [2 Sup. Ct. 279, 27 L. Ed. 484]. It is so well settled, and has so often been acted upon, that no authority need be cited in its support, though it must not be forgotten that the legal remedy must be as complete, practicable and efficient as that which equity could afford. Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 11 [19 Sup. Ct. 77, 43 L. Ed. 341]."

In New York, etc., Co. v. Memphis Water Co., 107 U. S. 214, 2 Sup. Ct. 286, 27 L. Ed. 484, the Supreme Court said:

"In view of the early enactment by Congress in the sixteenth section of the judiciary act (Rev. St. § 723), declaring 'that suits in equity shall not be sustained in either of the courts of the United States in any case where plain, adequate, and complete remedy may be had at law,' the rule laid down in Hayward v. Andrews [106 U. S. 672, 1 Sup. Ct. 544, 27 L. Ed. 271] is entitled to special consideration from the courts of the United States. This enactment certainly means something; and, if only declaratory of what was always the law, it must, at least, have been intended to emphasize the rule, and to impress it upon the attention of the courts."

Returning to Boise Water Co. v. Boise City, above, the court takes up and reviews a line of decisions of that court wherein equity was refused to take cognizance and grant injunctions solely upon the ground of the illegality or unconstitutionality of state legislation in the absence of facts disclosing some distinct head of equity cognizance. The line of cases reviewed are those in which federal courts have been asked to enjoin the collection of state taxes based upon illegal or unconstitutional state legislation. In Boise Water Co. v. Boise City, supra, it is said:

"It is quite possible that in cases of this sort the validity of a law may be more conveniently tested by the party denying it by a bill in equity than by an action at law; but considerations of that character, while they may explain, do not justify, resort to that mode of proceeding."

Then, in summing up the conclusions from the cases reviewed, the court said, at page 285, 213 U. S., at page 429, 29 Sup. Ct. (53 L. Ed. 796):

"It is safe to say that no case can be found where this court has deliberately approved the issuance of an injunction against the enforcement of an ordinance resting on state authority merely because it was illegal or unconstitutional, unless further circumstances were shown which brought the case within some clear ground of equity jurisdiction. These decisions make it clear that an injunction ought not to be granted unless the bill, besides alleging illegality and unconstitutionality of the ordinance imposing the license fee, sets forth other circumstances which bring the case within some acknowledged head of equity jurisdiction. The only suggestions of this kind which the bill presents are that the enforcement of the ordinance will lead to irreparable injury, to multiplicity of suits, and cast a cloud upon the company's title to its franchises. But there is nothing in the bill which leads us to suppose that any of these results would be brought about by leaving the company to its defense at law. If the city had taken any steps indicating a purpose to remove the pipes and works of the company from the streets of the city and to deny it the right to continue its business there would be clear reason for the interposition of a court of equity, for, if that were done illegally or unconstitutionally, an injury would be inflicted for which the law could afford no adequate remedy. In such a case it would be the plain duty of a court of equity to arrest the destructive steps until their legality or constitutionality could be determined. Such a course would be for the best interests of both parties."

It is true that the bill contains a vague allegation that the city has threatened to remove the company's pipes and works from the city, but no facts whatever are alleged showing such a threat. The city does not speak except by its council, and nothing has been said or done by it in this direction. On the contrary, the imposition of the license

fee and the bringing of a suit for its recovery contemplate continuance and not restraint of the business of the company.

In 16 Cyc. p. 60b, it is said:

"It is frequently stated that equity will assume jurisdiction for the purpose of preventing a multiplicity of suits. But this statement in its broad form is somewhat misleading. The mere fact that one is threatened with a multiplicity of suits, and that he is likely to become involved in numerous proceedings, does not alone entitle him to the aid of equity to avoid such situation. He must in addition show that some legal or equitable right is invaded or threatened."

See, also, numerous cases cited in footnote on same and following page, including both state and federal decisions. On the following pages the subject is discussed by the author, and the confusion of the authorities admitted. At page 65 the author, after having cited the principles in such cases, says:

"Nevertheless bills have been sustained where there was no connection among the different claims other than that they all depended upon the same question of fact and law arising out of the same transaction."

It is a curious fact that the very danger referred to by Chief Justice Campbell in Tribette v. Illinois Central Railroad is verified by an examination of the cases cited in footnote 79 to sustain the text just quoted, for every case cited in that footnote either does not sustain the text, or is readily distinguishable from it, or relies on Pomeroy for authority. Wyman v. Bowman, 127 Fed. 257, 62 C. C. A. 189, does not sustain it. Sang Lung v. Jackson (C. C.) 85 Fed. 502, does sustain it, and rests on Pomeroy. Hale v. Allinson, 188 U. S. 56, 23 Sup. Ct. 244, 47 L. Ed. 380, I think establishes the contrary when applied to the facts of this case, and is not authority which supports the text in any event. Tift v. Southern Railroad Co. (C. C.) 123 Fed. 789, does not support the text, and is readily distinguishable from the case at bar. The case of Hale v. Allinson, supra, has been found both instructive and profitable, and there is language in the nature of a dictum at the foot of page 78 tending to uphold the doctrine laid down by Pomeroy, at least in part, in some cases; but on the previous page the general rule as laid down by Pomeroy is distinctly repudiated. If it be conceded that this case falls within the rule stated in Tribette et al. v. Illinois Central Railroad Co., supra, because it appears from the bill that each of the defendants have a separate and distinct cause of action in equity to enjoin complainant from removing its central division from Mena, and therefore this suit will avoid a multiplicity of suits in equity against the complainant, the answer is found in the fact that if any such action is contemplated by the defendants, when suit is brought by any one of the defendants to enjoin the removal of the division from Mena, if maintainable at all, it will settle the whole question for all. No good, therefore, could come from repeated suits in equity to enjoin the removal, which had already been forbidden, and the court will indulge no such conclusion based upon mere threats "to institute an injunction or injunction suit." In Boise Artesian Water Co. v. Boise City, supra, the Supreme Court, at page 285, 213 U. S., at page 430, 29 Sup. Ct. (53 L. Ed. 796), said:

"Nor do we think that there is any danger of a multiplicity of suits in the sense that would authorize the issuance of an injunction. One suit only has been brought, and that by direction of the city council. It remains pending, and, when it reaches judgment, it will determine finally every question in dispute between the parties. There is no need of any other suit except to prevent the running of the statute of limitations, and nothing to indicate that any will be brought. Where the multiplicity of suits to be feared consists in repetitions of suits by the same person against the plaintiff for causes of action arising out of the same facts and legal principles, a court of equity ought not to interfere upon that ground unless it is clearly necessary to protect the plaintiff from continued and vexatious litigation. Something more is required than the beginning of a single action with an honest purpose to settle the rights of the parties. 1 Pomeroy's Eq. Juris. (3d Ed.) § 254. Perhaps it might be necessary to await the final decision of one action at law (see for analogies Sharon v. Tucker, 144 U. S. 533 [12 Sup. Ct. 720, 36 L. Ed. 532]; Boston, etc., Mining Co. v. Montana Ore Co., 188 U. S. 632 [23 Sup. Ct. 434, 47 L. Ed. 626]), but that we need not decide."

Moreover, such a suit in equity could never be maintained by the defendants if on final hearing it was determined that to grant an injunction against the removal of complainant's central division from Mena would either impose a burden on interstate commerce, create a congestion of its traffic, impair its service or inflict irreparable loss upon it, or prevent the enforcement of the act of Congress above referred to known as the eighteen hour law. Such a suit to be maintainable at all on any ground implies the existence of an enforceable contract between complainant and defendants, not in contravention or violative of or illegally interfering with any of those things. Otherwise the contract itself would be violative of the commerce clause of the Constitution, or the act of Congress regulating interstate commerce enacted in pursuance thereof. Nor do I think on the whole record as now exhibited any such result as a multiplicity of injunction suits by defendants is to be reasonably apprehended. The reasonableness and the soundness of this conclusion is demonstrated by the course this case has taken, for the defendants when brought into court in this case united in a cross-bill the avowed purpose of which is to enjoin the removal of the complainant's central division from Mena, and, if the court should refuse to do that and determine to grant the relief sought by complainant, then it seeks to have the damages sustained by each of the defendants by reason of the alleged breach of the contract between the complainant and the defendants assessed in this very suit. If it be conceded as true that one suit in equity by any one or all the defendants would settle the whole controversy between the parties, but complainant is threatened with a multiplicity of suits at law for damages for a breach of the contract by reason of complainant's intended removal of its central division point from Mena, two answers are ready: (1) No injunction will lie in the federal court to enjoin a multiplicity of damage suits, although growing out of one transaction. Tribette v. Illinois Central Railroad Co., supra. (2) No such results, on the record before me, could be reasonably apprehended.

I have before me the very able opinion of Judge Sanborn in Wyman v. Bowman, 127 Fed. 257, 62 C. C. A. 189, in which I find general passages which are broad enough perhaps to uphold the doctrine that courts of equity will always take jurisdiction to avoid a multiplicity of

suits, whether at law or in equity. It was Chief Justice Marshall who said in Cohens v. Virginia, 6 Wheat. 264, 5 L. Ed. 257: "It is a maxim not to be disregarded that general expressions in every opinion are to be taken in connection with the case in which those expressions are used.". A mere glance at the facts of the case of Wyman v. Bowman, supra, discloses a radical difference between the facts of that case and the one at bar. That was a case in which a receiver of an insolvent life insurance company sued several subscribers to the stock of the company for an unpaid balance on the stock. Cases along that line are numerous. I have examined every federal case cited in that case by Judge Sanborn, whose industry and attainments are both proverbial, and there is not one which is not readily distinguished by the facts from this case, and not one which supports the jurisdiction in a case like the one at bar. The strongest of them is Bailey v. Tillinghast, 99 Fed. 801, 40 C. C. A. 93, and Louisville, N. A. & Chicago Railway Co. v. Ohio Valley Improvement & Contract Company (C. C.) 57 Fed. 42. The latter case was heard on demurrer, and decided by Judge Lurton at circuit. It was a suit by a railroad company to cancel for fraud and illegality its guaranty of certain bonds of another company. The suit was against the holders of the bonds. The case is readily distinguishable from the one at bar and the expressions which give countenance to jurisdiction in a case of this kind are found in the body of the opinion and are in the nature of dicta. Curious enough he relies in that case solely upon Pomeroy's Equity Jurisprudence. The former case was decided by the Circuit Court of Appeals, of which Justice Lurton was then a member, and the opinion was written by District Judge Severens. That was a bill in equity by a receiver of an insolvent national bank against the stockholders to enforce an assessment against them. It hardly admits of discussion that equity has jurisdiction in such cases. The doctrine is sustained by a long, unbroken line of authorities. I need not refer to them. Judge Severens used some general expressions tending to give countenance to jurisdiction in a case like this, citing Louisville, N. A. & Chicago Railway Co. v. Ohio Valley Improvement & Contract Co., supra, thus tracing the principle back to Pomeroy's Equity Jurisprudence. What he said was not necessary to the decision of the case, and the precise question now under consideration was not before him.

Nor does it appear that, if this bill should finally be dismissed, any irreparable injury within the meaning of that term as used in connection with the jurisdiction of courts of equity would follow. The worst that could follow would be the institution of suits at law by the several defendants to recover damages against complainant for a breach of contract, and the recovery of judgments therefor which might become liens on its property if not paid. But that result is occurring every day, in all sorts of litigation, in all courts both of law and equity. And if that result is a ground of equity jurisdiction, then courts of equity would have jurisdiction in all cases, because all judgments may create a lien, and to that extent cloud a title. There are no substantive facts alleged or fair inferences to be indulged, from what appears in the bill, showing any other or different multiplicity of suits, or irreparable in-

jury, than that stated.   I do not understand that is sufficient to give a federal court of equity jurisdiction.   There must appear some distinct ground of equity cognizance, such as fraud, trust, accounting, removing cloud from title to property, removing causes for future litigation, or facts showing irreparable injury, or a threatened danger or actual existence of a multiplicity of suits which can be, within equity principles, all settled in one suit, and wherein there is no plain, adequate, and complete remedy at law.   Moreover, it should be said in this connection that there is no other community of interest among the defendants than their rights of action growing out of the alleged breach of the same contract.   As among themselves there is no privity or community of interest whatever.   Each has, if he have any cause of action at all, a separate and distinct cause of action, each depending necessarily in part at least on the facts of his own case.   To the extent that there was or was not a contract all the cases may be the same, as to the law and facts, but as to the right to recover and how much shall be recovered must depend on the particular facts of each case—the one in no sense connected with the other.

The conclusion is that the complainant has failed to make out a case of equitable cognizance, and the injunction prayed for must be refused.

Cross-Bill.  The defendants by their cross-bill seek a counter injunction restraining the removal of the complainant's central division from Mena; but it does not follow that because relief is denied the complainant defendants are entitled to affirmative relief on their cross-bill.   In the city of Tyler et al. v. St. Louis & Southwestern Railway Company of Texas et al. (Tex. Civ. App.) 87 S. W. 238, the situation of the parties on the record was reversed.   There the city brought suit against the railroad company to restrain it from the removal of the machine shops and general offices from Tyler to Texarkana.   There was practically no dispute, as in this case, that there was a written contract between the parties that the shops and general offices should perpetually remain and be operated at Tyler.   The court, after an exhaustive examination, in a well-considered and well-prepared opinion, held that the contract was not against public policy; but denied the injunction, and remitted the city to its suit at law for damages.   In Texas & Pacific Railway v. City of Marshall, 136 U. S. 393, 10 Sup. Ct. 846, 34 L. Ed. 385, it was held that a similar contract for a permanent location of the eastern terminus and Texas offices and machine and car works at Marshall, Tex., was satisfied by the location and maintenance for a period of eight years at that point, and that if the contract was to be construed to mean that the eastern terminus, shops, etc., should forever be maintained there, then the contract would not be enforced in equity, and that complainant's remedy was at law for a breach of the contract.   The same principle is announced in Beasley v. Texas & Pacific Railway Co., 191 U. S. 492, 24 Sup. Ct. 164, 48 L. Ed. 274, as applicable to a contract not to build a depot within three miles of another depot.   The court in that case said:

"There are more specific obstacles in the way of the bill.   Whether a railroad station shall be built in a certain place is a question involving public

interests. Assuming that a contract like the present is valid as a contract, and making the more debatable assumption that the burden of the contract passed to a purchaser with notice, it does not follow that such a contract will be specifically enforced. Illegality apart, a man may make himself answerable in damages for the happening or not happening of what event he likes. But he cannot secure to his contract the help of the court to bring that event to pass, unless it is in accordance with policy to grant that help. To compel the specific performance of contracts still is the exception, not the rule, and courts would be slow to compel it in cases where it appears that paramount interests will or even may be interfered with by their action. It has been intimated by this court that a covenant much like the present should not be enforced in equity, and that the railroad should be left at liberty to follow the course which its best interests and those of the public demand. Texas & Pacific Railway v. Marshall, 136 U. S. 393, 405 [10 Sup. Ct. 846, 34 L. Ed. 385]; Northern Pacific Railroad v. Territory of Washington, 142 U. S. 492, 509 [12 Sup. Ct. 283, 35 L. Ed. 1092]. See, further, Marsh v. Fairbury, Pontiac & Northwestern Ry., 64 Ill. 414 [16 Am. Rep. 564]; People v. Chicago & Alton Railroad, 130 Ill. 175, 184 [22 N. E. 857]; St. Joseph & Denver City Railroad v. Ryan, 11 Kan. 602 [15 Am. Rep. 357]; Pacific Railroad v. Seeley, 45 Mo. 212 [100 Am. Dec. 369]; Florida Central & Peninsular Railroad v. Florida, 31 Fla. 482, 508 [13 South. 103, 20 L. R. A. 419, 34 Am. St. Rep. 30]; Currie v. Natchez, Jackson & Columbus Railroad, 61 Miss. 725, 731; Holladay v. Patterson, 5 Or. 177; Texas & Pacific Ry. v. Scott [77 Fed. 726], 23 C. C. A. 424, 429 [37 L. R. A. 94]."

It is not necessary now to decide whether the cross-bill, if an original bill, could be maintained, and I purposely abstain from expressing any opinion on that question. I have cited the last three cases simply to show that if it should ultimately be determined that there was a contract between the parties to this suit, it does not necessarily follow that a restraining order should be granted. It is enough to say that on the record as now presented no restraining order should be granted, and it is refused.